JOHN B. NOBLE, JR., AND SUSAN S. NOBLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JAMES W. RUTLAND, JR., AND LUCILE H. RUTLAND, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9179–79, 9180–79.     Filed November 8, 1982.

*James M. Scott*, for the petitioners.
*Jillena A. Warner*, for the respondent.

IRWIN, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 9179–79 | John B. Noble, Jr., and Susan S. Noble | 1974 | $48,723.84 |
| 9180–79 | James W. Rutland, Jr., and Lucile H. Rutland | 1974 1975 | 9,063.30 24,021.06 |

Concessions having been made by the parties, the issues remaining for our decision are: (1) Whether petitioners John B. Noble, Jr. (Noble), and James W. Rutland, Jr. (Rutland), "paid" certain interest charges and fees representing interest within the meaning of section 163(a)[1] when they issued checks in satisfaction of such interest charges and fees to the First National Bank of Montgomery (FNB); (2) if the charges and

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue.

fees are not considered to have been paid when such checks were issued, whether they must be amortized over a 23-year financing period; and (3) whether petitioners John B. Noble, Jr., and Susan S. Noble must amortize "construction loan legal fees" in the amount of $6,349.25 over a 23-year financing period.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached to each stipulation are incorporated herein by this reference.

At the time of the filing of their petitions herein, Mr. and Mrs. Noble and Mr. and Mrs. Rutland resided in Montgomery, Ala. Each couple filed a joint Federal income tax return for the year 1974 with the Internal Revenue Service, Chamblee, Ga.

Noble and Rutland both keep their books on the cash basis.

In the early 1970's, Noble was the sole proprietor of J. Noble Construction Co. The company engaged in construction of shopping centers, schools, hospitals, and the like. At that time, Rutland was employed by Alabama Farm Bureau. In connection with such employment, he was responsible for "a lot [of] shopping center development." Noble was the general contractor on several of the shopping center jobs managed by Rutland. In 1972, Noble and Rutland decided that they would "join forces" to develop shopping centers for themselves.

During 1974 and 1975, Noble and Rutland each owned a one-half interest in the following shopping centers, which were in various stages of development:

| Center | Center location |
|---|---|
| Moulton East | Moulton, Ala. |
| Forestdale Plaza | Forestdale, Ala. |
| Irwin Square | Foley, Ala. |
| Childersburg Shopping Mart | Childersburg, Ala. |
| Grant City | Niceville, Fla. |

Grant City ........................................... Marianna, Fla.
Saufley Square ................................... Pensacola, Fla.

### Background on Financing of Shopping Centers

After finding a suitable location for a shopping center and contacting prospective tenants, Noble and Rutland would enter into an oral understanding with FNB[2] for a construction loan relative to the proposed center. They would also contact Jackson Co. (Jackson), a mortgage broker, for assistance in obtaining permanent financing for the proposed center.

Noble and Rutland engaged in separate negotiations for construction loans from FNB and for permanent loans. Since FNB could not make a construction loan for a period longer than 3 years, it required Noble and Rutland to secure a permanent loan that would be funded within that time. Otherwise FNB was uninterested as to the terms of the permanent loans negotiated by Noble and Rutland. A permanent lender is likewise not concerned about the identity of the construction lender, since a permanent lender is not obligated to, and will not, fund its loan until construction is completed and the terms contained in its commitment letter have been satisfied.

After arranging for both a construction loan and a permanent loan for a proposed center, Noble and Rutland entered into a triparty agreement. A triparty agreement is an agreement between the two lenders and the borrower. It consists of three separate documents: a note, a mortgage, and an agreement to assign. Detailed descriptions of the pertinent provisions contained in the agreements to assign and the notes follow later in these findings of fact. By using a triparty agreement, a permanent lender gains added assurance that if the rate of interest charged by permanent lenders were to decrease significantly between the time when it issues its commitment letter and the time when construction of a project is completed, the borrower would not borrow from another lender. The agreement gives this additional confidence to the permanent lender because once it is executed, the permanent

---

[2]Noble and Rutland had each used FNB as his bank for a number of years before they began to develop shopping centers together. Consequently, it was natural for Noble and Rutland to use FNB as their construction lender.

lender has not only the borrower's promise to incur the debt, but it, in effect, also has the construction lender's promise that it will not allow anyone else to fund the permanent loan.

## Construction Loans

FNB was the construction lender for each of the shopping centers listed on pages 753–754. For each construction loan, Noble and Rutland entered into a separate agreement with FNB. The loan agreements were standard forms used by FNB. Section 4 of each agreement provides that proceeds of the loan are "to be advanced from time to time" for specified expense items, including construction interest and a commitment fee.[3] Section 4 further provides as follows:

> Elsewhere in this Agreement it is provided that advances from loan proceeds for construction costs and other amounts payable to the general contractor pursuant to the terms of the construction contract between Borrower and the general contractor shall be payable to the general contractor alone. It is agreed that interest on the construction mortgage loan of Borrower in favor of Lender shall be charged directly against loan proceeds, and such charges shall constitute disbursement of loan proceeds hereunder. Nothing herein contained, however, shall mitigate Borrower's obligation to pay to Lender on demand said interest if Lender has exercised its option hereafter provided for to make no further advances of loan proceeds.

Although Noble and Rutland were not required by FNB to deposit construction loan proceeds in accounts at FNB, they chose to maintain a separate bank account for each shopping center at FNB. A separate account was kept for each center to facilitate accounting for the costs of each project. Nevertheless, when Noble and Rutland needed to transfer funds out of one project's account in order to pay liabilities incurred relative to construction of another project, they would do so. FNB knew that Noble and Rutland were using funds borrowed for one project to pay for costs of other projects.

Despite the above-quoted provisions of the construction loan agreements, FNB disbursed all loan proceeds to Noble and Rutland, without withholding any amounts for fees and

---

[3]The agreements provided that such items of expense, other than amounts payable to the general contractor, would be "disbursed by the Lender to the Borrower at the time the same are payable."

interest. Noble and Rutland deposited the loan proceeds in the shopping centers' accounts at FNB. They then drew checks on the shopping centers' accounts for the interest and the commitment fees when they were due. The parties have stipulated that the comitment fees paid[4] to FNB represent interest charged by FNB.

The parties have submitted an exhibit (Joint Exhibit 6-F) summarizing the deposits to each shopping center's account and the amounts withdrawn from each shopping center's account to pay interest and fees and to advance funds to other shopping centers' accounts. The amounts listed in that summary as having been deposited to, and withdrawn to pay interest and fees from, the checking accounts for the Moulton, Forestdale, Childersburg, Niceville, and Marianna shopping centers are indicated in the table beginning on this page. All amounts listed in the column entitled "Loan proceeds" represent deposits of loan proceeds withdrawn from FNB. The amounts listed under the heading "From other accounts" represent deposits resulting from transfers of funds from accounts of other shopping centers.[5]

### SUMMARY OF SHOPPING CENTERS' ACCOUNTS

| | Deposits | | | | Withdrawls | |
|---|---|---|---|---|---|---|
| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
| | | | Moulton East | | | |
| 8/23 | | | [1] $375.00 | | | |
| 9/27 | $104,800.00 | | | | | |
| 9/27 | | | | | | [2] $8,150 |
| 9/30 | 100,000.00 | | | | | |
| 10/10 | 210,273.00 | | | | | |
| 11/1 | | | | | $4,093.75 | |
| 11/11 | 226,007.00 | | | | | |

[4]The use of the term "paid" in the findings of fact is for narrative convenience only, and is not intended to represent any factual conclusion concerning the true nature of the transactions discussed, which is at issue herein.

[5]Throughout the years in issue, Noble's liquid assets, exclusive of proceeds from the construction loans, were at least between $100,000 and $250,000.

| | Deposits | | | Withdrawls | |
|---|---|---|---|---|---|
| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
| 11/20 | | | $1,791.97 | | | |
| 12/2 | | | | | $5,696.20 | |
| 12/6 | | | 3,206.25 | | | |
| 12/18 | | | 1,088.88 | | | |

### Forestdale Plaza

| | Deposits | | | Withdrawls | |
|---|---|---|---|---|---|
| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
| 8/26 | [1]$250,000.00 | | | | | |
| 9/10 | 411,172.74 | | | | | |
| 9/13 | | | | $1,000 | | |
| 9/13 | | | | | | $10,000 |
| 10/1 | | | | | 2,636.01 | |
| 10/10 | | $100,000.00 | | | | |
| 10/22 | | 9,048.00 | | | | |
| 11/1 | | | | | 4,539.80 | |
| 11/11 | 117,205.26 | | | | | |
| 12/2 | | | | | 4,926.61 | |
| 12/10 | 181,526.00 | | | | | |
| 12/12 | | | | | | 1,500 |

### Childersburg Shopping Mart

| | Deposits | | | Withdrawls | |
|---|---|---|---|---|---|
| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
| 5/24 | [1]155,195.00 | | | | | |
| 5/24 | | | | | | 8,150 |
| 6/18 | 111,706.00 | | | | | |
| 7/1 | | | | | 2,365.96 | |
| 7/2 | | | 457.50 | | | |
| 7/10 | 103,802.00 | | | | | |
| 8/1 | | | | | 3,398.67 | |
| 8/5 | | | 700.00 | | | |
| 8/8 | 130,707.00 | | | | | |
| 9/3 | | | | | 4,766.54 | |
| 9/10 | 137,624.00 | | | | | |
| 10/1 | | | | | 5,895.58 | |
| 10/10 | 87,018.00 | | | | | |
| 10/10 | | 38,047.63 | | | | |
| 10/11 | | | 150.00 | | | |
| 10/22 | | | 300.00 | | | |
| 11/1 | | 1,000.00 | | | | |
| 11/1 | | | | | 7,149.29 | |
| 11/11 | 41,000.00 | | | | | |
| 11/11 | | | 2,529.84 | | | |
| 12/1 | | | | | 6,966.23 | |
| 12/6 | | | 3,206.25 | | | |
| 12/10 | 47,948.00 | | | | | |
| 12/12 | | 8,096.00 | | | | |

| Date 1974 | Deposits | | | | Withdrawls | |
| --- | --- | --- | --- | --- | --- | --- |
| | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |

### Grant City

| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
| --- | --- | --- | --- | --- | --- | --- |
| 1/29 | | | [1]$300.00 | | | |
| 3/4 | $70,488.00 | | | | | |
| 3/5 | | | | | | $10,500 |
| 3/21 | 70,576.00 | | | | | |
| 4/1 | | | | | $753.42 | |
| 4/15 | 261,423.00 | | | | | |
| 5/1 | 275,392.00 | | | | | |
| 5/1 | | | | | 2,233.77 | |
| 5/10 | | $14,602.50 | | | | |
| 5/30 | | 189,376.36 | | | | |
| 6/3 | | | | | 5,078.28 | |
| 6/10 | 53,542.00 | | | | | |
| 6/30 | | 189,376.36 | | | | |
| 7/1 | | | | | 5,864.99 | |
| 7/10 | 141,938.00 | | | | | |
| 8/1 | | | | | 7,067.59 | |
| 8/8 | 94,941.00 | | | | | |
| 9/3 | | | | | 8,015.82 | |
| 9/10 | 34,159.00 | | | | | |
| 10/1 | | | | | 8,155.16 | |
| 10/8 | 32,266.00 | | | | | |
| 10/11 | | | 9,557.62 | | | |
| 10/25 | | | 300.00 | | | |
| 10/30 | | | 244.32 | | | |
| 11/1 | | | | | 8,708.52 | |
| 11/6 | | 3,715.84 | | | | |
| 11/11 | | 15,275.00 | | | | |
| 11/11 | 15,275.00 | | | | | |
| 11/12 | | | 8,897.50 | | | |
| 11/27 | | | 300.00 | | | |
| 12/1 | | | | | 8,588.28 | |
| 12/2 | | | 3,715.84 | | | |
| 12/10 | | | 8,897.50 | | | |
| 12/10 | | | | | 2,876.72 | |
| 12/13 | | 37,926.63 | | | | |
| 12/31 | | 312.65 | | | | |

### Grant City (Marianna)

| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
| --- | --- | --- | --- | --- | --- | --- |
| 2/18 | [1]158,000.00 | | | | | |
| 2/19 | | 1,000.00 | | | | |
| 3/14 | | | 850.00 | | | |
| 3/14 | | | 2,000.00 | | | |

| Date 1974 | Loan proceeds | From other accounts | Rents | Advances from Noble and Rutland | Interest to FNB | Fees |
|---|---|---|---|---|---|---|
| 3/14 | | | $450.00 | | | |
| 5/24 | | | | | | ³___ |
| 5/29 | $409,658.00 | | | | | |
| 5/29 | | | | | $1,904.46 | |
| 6/10 | 232,690.00 | | | | | |
| 6/10 | 306,518.00 | | | | | |
| 7/1 | | | | | 6,347.93 | |
| 8/1 | | | | | 9,311.41 | |
| 8/8 | 332,478.00 | | | | | |
| 8/8 | | | 135.00 | | | |
| 9/3 | | | | | 13,200.12 | |
| 9/10 | 134,251.00 | | | | | |
| 9/28 | | | | | 14,695.20 | |
| 10/10 | 44,244.00 | | | | | |
| 10/10 | | $100,000.00 | | | | |
| 10/11 | | | 9,568.05 | | | |
| 11/1 | | | | | 15,976.39 | |
| 11/1 | 83,440.00 | | | | | |
| 11/2 | | 82.00 | | | | |
| 11/2 | | 600.33 | | | | |
| 11/2 | | | 9,263.50 | | | |
| 11/11 | | 30,000.00 | | | | |
| 12/1 | | | | | 15,258.46 | |
| 12/10 | 56,721.00 | | | | | |
| 12/10 | | 27,206.55 | | | | |
| 12/12 | | 1,298.63 | | | | |
| 12/18 | | | 9,263.50 | | | |

[1] The parties have stipulated that the designated amounts are the beginning balances in the respective checking accounts.

[2] The loan agreement that was executed by Noble and Rutland respecting the construction loan for the shopping center situated in Moulton provides (at par. 14):

"Borrower shall pay Lender a commitment fee of $8,150.00, payable within five (5) days after the execution of this Loan Agreement."

[3] On the summary sheets respecting the bank account maintained for the shopping center and Marianna, the only entry indicating a withdrawal to pay fees has been erased. That entry appears to have reflected a payment of $16,000 to FNB on May 24, 1974. An entry that appears to have shown a deposit of $16,000 made from construction loan proceeds on May 24, 1974, has also been erased on the summary sheets for the Marianna shopping center.

### Permanent Loans

Protective Life Insurance Co. (Protective) is the permanent lender for the shopping centers located in Niceville, Childersburg, Foley, Moulton, and Pensacola.

Protective issued a commitment letter, dated December 6, 1973, to Noble, Rutland, and Jackson, whereby it agreed to

purchase on assignment from the construction lender the mortgage loan for the shopping center in Niceville. The commitment letter sets forth numerous conditions precedent to Protective's being obligated to purchase the mortgage loan, including that Protective receive an architect's certificate stating that the shopping center has been completed in accordance with plans and specifications approved by it, that either a licensed engineer or a surveyor survey the completed center, and that a title insurance company acceptable to Protective issue a mortgagee's title insurance policy, insuring Protective a first lien on the real estate with no exceptions other than taxes resulting in a lien but not yet being due and payable. Paragraph 10 of the commitment letter provides as follows:

> The loan is to be "pre-closed," i.e., the note and mortgage will be combined construction loan—permanent loan documents, and the enclosed Agreement to Assign shall be executed by Borrower, Correspondent [Jackson] and Borrower's construction lender and returned to Protective for its signature within 30 days from the date of this letter. If the Agreement to Assign is not so returned within 30 days, Protective shall have the right, at its option, to cancel this commitment.

The construction lender is not mentioned by name in the commitment letter.

Protective issued similar commitment letters dated April 25, 1974, and May 8, 1974, whereby it agreed to purchase on assignment the mortgage loans for the shopping centers located in Childersburg and Moulton, respectively, from the construction lenders, provided certain terms and conditions were met. These letters also provided that the loans were "to be pre-closed." The letters further required that Agreements to Assign which were sent with the letters be executed and returned to Protective within 45 days.

Pursuant to paragraph 10 of Protective's commitment letter respecting the shopping center located in Niceville, on December 28, 1973, Noble and Rutland executed a promissory note that is a combined construction loan permanent loan document. That promissory note provides, in pertinent part, as follows:

> FOR VALUE RECEIVED, the undersigned James W. Rutland, Jr., and John B. Noble, Jr., jointly and severally, hereby promise to pay to the order of [the FNB] at Montgomery, Alabama, or at such other place or to such

other party or parties as the holder of this note may from time to time designate, the principal sum of One Million Fifty Thousand and No/100 Dollars ($1,050,000.00), or so much thereof as may be advanced, with interest thereupon computed from date of each advance at the rate of ten percent (10%) per annum, interest only to be payable on the first day of each month to and including December 1, 1974, except that the foregoing notwithstanding, as, if and when [Protective] acquires this note, then FOR VALUE RECEIVED, the undersigned promises to pay to [Protective], or order, at its principal office in Birmingham, Alabama, or at such other place as may be designated in writing by the holder of this note, the principal sum of One Million Fifty Thousand and No/100 Dollars ($1,050,000.00) together with interest at the rate of nine percent (9%) per annum, payable in monthly installments of principal and interest in the sum of Nine Thousand Thirty and No/100 Dollars ($9,030.00), to be applied first to the payment of interest and the balance in the reduction of principal, commencing on the first day of the month next following the day upon which [Protective] acquires this note, and on the first day of each and every month thereafter for twenty-three (23) years, with the last installment being due and payable on the first day of the last month of said twenty-three (23)-year term, at which time the entire unpaid balance together with accrued interest shall be due and payable. * * *

On May 21, 1974, Noble and Rutland executed a similar note regarding the shopping center located in Childersburg. That note also provides that a modification of its terms and interest rates will result if and when Protective acquires it. The interest rate payable to FNB is its prime rate as of the first day of each month for which interest is due. The interest rate payable to Protective, if it acquires the note, is 9.25 percent per annum.

On September 25, 1974, Noble and Rutland executed a promissory note that is a combined construction loan/permanent loan document respecting the shopping center located in Moulton. It provides that the rate of interest payable to FNB will be 1 percent above the prime rate of interest of FNB, on the first day of each month for which interest is due. It further provides that, if and when Protective acquires the note, interest will be payable at the rate of 9⅜ percent per annum.

Pursuant also to paragraph 10 of the commitment letter issued by Protective regarding the shopping center situated in Niceville, on December 28, 1973, Noble and Rutland, Jackson, FNB, and Protective executed an "Agreement to Assign" (the agreement). The agreement provided that, upon completion of construction of the shopping center in Niceville as required by Protective's commitment, FNB would advance the full amount

of the loan that Protective had made a commitment to purchase. It further provided that, at such time, FNB would tender to Protective "the Note (endorsed, without recourse on [FNB]) and an unconditional, nonparticipating assignment of all of [FNB's] title and interest in the Note, Mortgage and any other collateral instruments held by it." Protective agreed that it would accept such tender and assignment by FNB and would purchase "the Loan" from FNB at par, provided that all the terms, requirements, and conditions of its commitment were satisfied. FNB also agreed that it would accept no payments of principal on the loan, except as allowed by the commitment, during the term of the commitment. The commitment contains no terms permitting the construction lender to accept principal payments while it is in effect. Under the agreement, if Protective failed to purchase the loan by December 15, 1974 (or such other date as Protective and FNB might agree upon), FNB would not be precluded from invoking any of its remedies. Under the loan agreement entered into on the same day by FNB and Noble and Rutland, the entire principal balance of the loan would become due and payable on December 15, 1974, if it had not done so earlier pursuant to other provisions of the loan agreement.[6]

Noble and Rutland, Jackson, FNB, and Protective likewise executed documents entitled "Agreement to Assign" regarding the shopping centers located in Childersburg and Moulton on May 21, 1974, and September 25, 1974, respectively. These documents are virtually identical to the document that was entered into regarding the shopping center situated in Niceville.[7]

City Federal Savings & Loan Association (City Federal) is the permanent lender for the shopping center located in

---

[6]Under the loan agreement, FNB had the right to make the note due and payable on the occurrence of any of the following events: (1) A violation by Noble and Rutland of any term of the loan agreement, the note, or the instruments securing the loan; (2) a failure of Protective's commitment to remain in full force and effect; (3) an inspection of the project by FNB causing it to feel that construction was not proceeding in such a manner that the permanent loan could be consummated within the commitment period; or (4) a discovery of an objectional defect in the title to the property.

[7]All the documents only differ from each other in that they provide different loan amounts, different dates on which the commitment letters were issued, and different dates on which FNB would be free to sell the mortgage loan to another individual, if Protective failed to purchase it.

Forestdale. The parties have stipulated that where City Federal was the permanent lender, essentially the same type of loan transaction occurred as where Protective was the permanent lender.

The permanent lender funds its loan by wiring the proceeds to an independent attorney or a title company, rather than to the construction lender. The attorney or the title company then disburses the money so as to guarantee the permanent lender a valid first mortgage lien. The borrower must arrange for any outstanding construction loan to be paid off when the permanent lender is ready to fund its loan, so that the permanent lender can obtain a first lien on the property. So long as "the construction loan is paid off," the permanent lender does not care how the borrower uses the proceeds of the permanent loan.

The dates on which the permanent lenders funded their loans are as follows:

| Center location | Date funded |
| --- | --- |
| Moulton | July 23, 1975 |
| Forestdale | Feb. 28, 1975 |
| Foley | Sept. 20, 1974 |
| Childersburg | May 15, 1975 |
| Niceville | Dec. 11, 1974 |
| Marianna[8] | |
| Pensacola | Apr. 1, 1974 |

*Deductions in Dispute*

Fees charged during the year 1974 in connection with the loans on the shopping centers, including the fees listed in the table beginning on page 756, are as follows:

| Center | Amount | Payee |
| --- | --- | --- |
| Moulton | $8,150 | FNB |
| | 16,300 | Jackson |

---

[8] When Noble and Rutland began construction of a shopping center, they did not always have a commitment from a permanent lender. In the case of the shopping center located in Marianna, they did not get a permanent mortgage loan until 2½ years after construction was completed.

| Forestdale | $10,000 | FNB |
|---|---|---|
| | 650 | Jackson |
| | 2,500 | City Federal |
| Foley | ........... | |
| Childersburg | 8,150 | FNB |
| | 16,300 | Jackson |
| Niceville | 10,500 | FNB |
| | 10,500 | Jackson |
| Marianna | 16,000 | FNB |
| Pensacola | 8,250 | Jackson |

On their 1974 income tax return, Rutland and his wife claimed a deduction in the amount of $18,500 for certain fees paid in connection with the shopping centers. Noble and his wife claimed, on their 1974 income tax return, a deduction in the amount of $39,290 for certain fees paid in connection with the shopping centers. Respondent disallowed the deductions for such fees claimed by both Mr. and Mrs. Noble and Mr. and Mrs. Rutland. Petitioners have conceded the correctness of these adjustments, insofar as they pertain to fees paid to Jackson and City Federal. However, they contest the disallowance of such deductions to the extent they were claimed for fees paid to FNB.[9]

On their 1974 tax return, Mr. and Mrs. Noble claimed a deduction in the amount of $207,334 for interest incurred in connection with the shopping centers listed on pages 753–754. Of this amount, $133,168.44 was for construction interest. Respondent disallowed $57,630.12 of the deduction claimed on

---

[9]On their tax return, the Nobles apparently lumped together deductions claimed for interest and for fees paid with respect to each of the shopping centers. As a result, the amount deducted for fees paid to FNB is not clearly shown on their return. The notice of deficiency also contains no clue as to the amount deducted by the Nobles for fees paid to FNB.

The Rutlands' tax return indicates that they deducted $8,000 for fees paid to FNB in connection with the Marianna shopping center. The return also shows that they deducted $10,500 for fees paid with respect to the shopping center in Niceville, but we are unable to discern, by examining the return and the notice of deficiency, what portion, if any, of such deduction is allocable to fees charged by FNB.

Although petitioners request on brief that we make certain findings of fact as to the amounts of deductions claimed for fees paid to FNB that were disallowed by respondent, which are uncontested by him, the record is devoid of evidence as to such amounts. We do not think the amounts deducted for fees paid to FNB are subject to dispute and, therefore, trust that the parties will be able to resolve this matter in their Rule 155 computations.

the ground that Mr. and Mrs. Noble had not established that such amount was paid.[10] Respondent capitalized the disallowed portion of the construction interest and amortized it over a 23-year financing period.

Mr. and Mrs. Rutland capitalized their portion of the construction interest for the taxable year 1974.

On their 1974 income tax return, Mr. and Mrs. Noble claimed deductions for construction loan legal fees, which were incurred in connection with obtaining the shopping center loans. Respondent determined that certain of those legal fees in the amount of $9,956.75 constitute capital expenditures and, accordingly, are nondeductible as provided by section 263. Respondent further determined that, of such amount, $3,627.50 should be amortized over a 10-year period, and $6,349.25, which is stipulated to be "constructed [sic] loan legal fees," should be amortized over a 23-year financing period. Mr. and Mrs. Noble now concede that the $3,627.50 should be amortized over 10 years. They, however, dispute respondent's treatment of the $6,349.25.

## OPINION

We are first presented with the question whether checks issued by Noble and Rutland in satisfaction of interest obligations and fees stipulated to represent interest owing to FNB resulted in the payment of such interest and fees. Second, we must determine whether each shopping center was fi-

---

[10]The amount of interest claimed for each shopping center for 1974 and the amount disallowed by respondent for each shopping center is as follows:

| Center location | Amount claimed | Amount disallowed |
|---|---|---|
| Moulton | $9,789.95 | $7,622.98 |
| Forestdale | 13,705.16 | 13,705.16 |
| Foley | 52,829.44 | 0 |
| Childersburg | 30,535.26 | 21,693.54 |
| Niceville | 56,589.13 | 36,415.61 |
| Marianna | 77,586.77 | 35,822.95 |
| Pensacola | 25,301.17 | 0 |
| | 266,336.88 | 115,260.24 |
| Noble half interest | 133,168.44 | 57,630.12 |

In respondent's brief, he states that he erroneously allowed the deduction of amounts equal to the gross amount of rent received in each shopping center's account, but that he will not affirmatively pursue the disallowance of such amounts. See notes 11 & 15 infra.

nanced by a single loan extending over a 23-year period, so as to require that construction loan legal fees and any interest and fees considered unpaid be amortized over such period.

Noble and Rutland initially argue that, when they drew checks payable to FNB for interest charges and commitment fees representing interest, such charges and fees were "paid," within the meaning of section 163(a). Alternatively, they argue that, when the loans from FNB "were paid off from the proceeds of permanent loans," the interest must be deemed paid. Respondent, on the other hand, contends that the loans from FNB were in the nature of discounted loans and, therefore, the interest is not deductible in the years in issue.[11] He further contends that there was only one note representing one loan for each shopping center that was payable to the construction lender and the permanent lender over a 23-year financing period. Thus, he concludes that the interest and commitment fees should be amortized over the 23-year life of such loans.

In the case of cash basis taxpayers, such as petitioners, section 163(a)[12] generally permits a deduction only for interest "paid" within the taxable year. The payment must be made in cash or its equivalent; the taxpayer's promissory note is not the equivalent of cash, but merely a promise to pay. *Battelstein v. Internal Revenue Service*, 631 F.2d 1182, 1183–1184 (5th Cir. 1980). Similarly, where a cash basis taxpayer receives the principal amount of a loan less the amount of interest on the loan (a discounted loan), it has consistently been held that the amount of interest withheld by the lender has not been paid. *Rubnitz v. Commissioner*, 67 T.C. 621, 628 (1977); *Cleaver v. Commissioner*, 6 T.C. 452, 454 (1946), affd. 158 F.2d 342 (7th Cir. 1946).

In sharp contrast are the differing tax results where a taxpayer receives the full principal amount of a loan from one lender, obtains a loan from a second lender to discharge the

---

[11]Respondent states, in his briefs, that he erroneously allowed petitioners deductions for interest in an amount equal to the gross amount of rental income received in each shopping center's account. (See note 15 *infra*.)

[12]SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

interest payable to the first lender, and pays the first lender such interest with the funds obtained from the second lender. Under those circumstances, the interest is considered paid when the funds are transferred to the first lender, not when the second lender is repaid. *Crown v. Commissioner*, 77 T.C. 582, 593–595 (1981). See *Heyman v. Commissioner*, 70 T.C. 482, 485 (1978), affd. without published opinion 633 F.2d 215 (6th Cir. 1980). A disparity of result, therefore, arises among cases where the economic impact is similar.[13] As we recently stated in *Franklin v. Commissioner*, 77 T.C. 173, 184 (1981), revd. on other grounds 683 F.2d 125 (5th Cir. 1982), however, "we proceed on the basis that the taxpayer will ordinarily be bound by the tax consequences of the form he has chosen."

Where a taxpayer has borrowed cash from his original lender to repay interest owing to that same lender, this Court has allowed an interest deduction provided that the taxpayer exercised unrestricted control over the borrowed money.[14] See *Franklin v. Commissioner, supra* at 183–184; *Rubnitz v. Commissioner, supra* at 629. Loan proceeds are not considered to be subject to the taxpayer's unrestricted control where a lending institution simply credits them to an account of the taxpayer maintained with it and the taxpayer immediately

---

[13]See Feder, "Financing Real Estate Construction: The IRS Challenge to Construction Period Deductions," 8 J. of Real Est. Taxation 3, 23 (1980).

[14]In *Battelstein v. Internal Revenue Service*, 631 F.2d 1182 (5th Cir. 1980), and *Wilkerson v. Commissioner*, 655 F.2d 980 (9th Cir. 1981), revg. 70 T.C. 240 (1978), the Courts of Appeals for ·the Fifth and Ninth Circuits, respectively, enunciated a prerequisite to application of the unrestricted control test. Specifically, in both cases, the decisive factor, which led the Courts to hold that interest was not "paid," despite the fact that the taxpayers could be said to have had unrestricted control of the loan proceeds, was that funds had been borrowed for the purpose of paying interest on the loans.

Since the case before us is appealable to the Eleventh Circuit, which has announced that it will consider binding as precedent decisions of the Fifth Circuit handed down prior to Oct. 1, 1981 (*Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981)), we note that, in our judgment, the present case is distinguishable from *Battelstein*. Here, Noble and Rutland did not defer payment of current interest obligations by substituting new promissory notes in their place. (See *Battelstein v. Internal Revenue Service, supra* at 1185.) Moreover, neither did Noble and Rutland receive any checks from FNB in an amount identical to current interest obligations owing to FNB for the single purpose of financing such obligations. Rather, all funds were disbursed to Noble and Rutland as integral parts of multipurpose construction loans.

We also note that here, unlike in *Wilkerson v. Commissioner, supra* at 983, there is evidence that, throughout the years in issue, Noble had liquid assets available which, if necessary, could have been used to satisfy the interest obligations.

issues a check to the lending institution. *Watson v. Commissioner*, 8 T.C. 569 (1947); *Ferris v. Commissioner*, 38 B.T.A. 312 (1938), affd. per curiam 102 F.2d 985 (2d Cir. 1939). This rule is soundly premised upon the fact that, under such circumstances, only an inconsequential crediting and debiting of the taxpayer's account has occurred; neither cash nor its equivalent has passed between the borrower and the lender. *Watson v. Commissioner, supra*; *Ferris v. Commissioner, supra*. Thus, such an integrated transaction is tantamount to a discounted loan in that the funds never go through the borrower's hands or pass through his bank account. On the other hand, commingling by the taxpayer of loan proceeds with his own funds in a bank account not maintained with the lender has been treated as evidence of unrestricted control. *Burck v. Commissioner*, 63 T.C. 556, 559–560 (1975), affd. 533 F.2d 768 (2d Cir. 1976); *Burgess v. Commissioner*, 8 T.C. 47, 49 (1947).

Keeping the rules mentioned above in mind, we turn now to our first inquiry: whether the fees and interest owed to FNB should be viewed as having been "paid," for purposes of section 163, as of the time Noble and Rutland issued checks therefor to FNB.

Relying on our decisions in *Burck*, *Burgess*, and *Wilkerson v. Commissioner*, 70 T.C. 240 (1978), revd. 655 F.2d 980 (9th Cir. 1981), petitioners take the position that they had unrestricted control of the loan proceeds disbursed by FNB because: (1) Noble and Rutland could have withdrawn the entirety of the disbursed proceeds from their checking accounts; (2) FNB neither exercised control over the checking accounts nor charged the interest against the loan proceeds; and (3) the funds in each shopping center's account were commingled with rents, advances from Noble and Rutland, and loan proceeds for other shopping centers.

On the other hand, as earlier noted, respondent asserts that the loans from FNB were in the nature of discounted loans. In this connection, he points out that the loan agreements provide that interest is to be charged directly against loan proceeds prior to disbursement of the loan proceeds. Relying on *Get it Kwik of America v. First Ala. Bank*, 361 So. 2d 568, 571 (Ala. Civ. App. 1978), respondent further asserts that Noble and Rutland lacked unrestricted control of the loan proceeds because FNB had a right of setoff provided by

Alabama State law which it could have exercised if Noble and Rutland had been delinquent in making the required interest payments. Finally, respondent points out that *Wilkerson*, *Burck*, and *Burgess* are distinguishable from the present case in that in each of those cases, the loan proceeds were deposited to an account of the taxpayer outside the lender's domain.

In the instant case, we are unable to subscribe fully to either side's point of view. As we see it, we are presented with two distinguishable factual patterns: (1) The satisfaction of commitment fees representing interest and (2) the satisfaction of periodic interest.

Looking first at the funds used to satisfy obligations to FNB for commitment fees representing interest, we are compelled to conclude that Noble and Rutland had no unrestricted control over such funds.

As to the funds used to discharge the commitment fees relating to the Moulton, Forestdale, Childersburg, and Niceville shopping centers, the presence of three facts leads us to this conclusion: (1) The funds never left FNB, (2) Noble and Rutland received the loan proceeds and drew checks payable to FNB essentially simultaneously, and (3) Noble's and Rutland's other funds in each of the checking accounts were de minimis (less than 1 percent of the amount deposited to the account) when the check for the fees was drawn on it. (See table beginning on p. 756 *supra*.) *Franklin v. Commissioner*, *supra* at 187.

No evidence, other than apparently erased entries on the summary sheets (submitted as Joint Exhibit 6-F), was presented as to the circumstances surrounding the discharge of the obligation for fees on the construction loan for the Marianna shopping center. Since petitioners have not satisfied their burden of proof in this regard, we must presume that the funds used to pay the fees on the Marianna shopping center's construction loan were not subject to petitioners' unrestricted control.

In accordance with the foregoing, we conclude that the issuance of checks by Noble and Rutland for the commitment fees representing interest owed to FNB did not result in the payment of such fees, within the meaning of section 163.

The periodic interest presents, however, a different situation. Unlike in the case of the commitment fees, in most

instances, the deposit of loan proceeds to each of Noble's and Rutland's checking accounts and the drawing of checks thereon to FNB for periodic interest were not essentially simultaneous. In addition, before many of the checks were drawn for periodic interest, additional funds from sources other than the construction loan respecting the project for which a checking account was maintained had been deposited to the checking account on which the checks were drawn.

There is, of course, at least one point of similarity between the periodic interest and commitment fees; namely, all the construction loan proceeds were deposited to checking accounts maintained at FNB. This fact, standing alone, is not decisive. In *Wilkerson*, *Burck*, and *Burgess* (in which we found that the taxpayers had the requisite unrestricted control over loan proceeds so as to have "paid" interest), as respondent points out, the loan proceeds were deposited to accounts outside the lender's domain. In fact, in *Wilkerson*, we emphasized that where loan proceeds are deposited to a taxpayer's account within the lender's domain and immediately retransferred to the lender, no "payment" is deemed to occur.[15] As noted earlier, such an integrated transaction is tantamount to a discounted loan. Nevertheless, we have, as respondent recognizes, never adopted the restrictive view that loan proceeds deposited by a taxpayer to a bank account maintained with the lender cannot be considered subject to the taxpayer's unrestricted control. Rather, there must be additional indicia of an absence of unrestricted control. We, therefore, must decide the propriety of respondent's contention that FNB's right to discount the construction loans and/or the right of setoff provided by Alabama State law restricted Noble's and Rutland's control over the loan proceeds.

In support of his contention that FNB's right to withhold interest from the loan proceeds, although unexercised, causes this case to be governed by the discounted-loan cases, respondent relies on *Heyman v. Commissioner*, 70 T.C. 482 (1978), affd. 633 F.2d 215 (6th Cir. 1980); *Rubnitz v. Commissioner*, 67

---

[15]See note 14 *supra*.

T.C. 621 (1977); and *Howard v. Commissioner*, T.C. Memo. 1977–287.[16]

Respondent's reliance is misplaced because all the cases cited by him involved the actual withholding of interest charges. Here, FNB did not deduct any amounts for periodic interest. It collected such interest from Noble and Rutland. After receiving funds from FNB, Noble and Rutland were not required to hold any of them in trust or in accounts maintained with FNB to be applied to construction loan interest charges. Instead, they were free to transfer disbursed funds out of one project's account to another project's account and to further transfer them out of FNB. Moreover, Noble and Rutland were free to use funds derived from a source other than a project's construction loan to discharge interest owing on its construction loan; that is, they were free to make an independent cash payment of interest as such. *Burgess v. Commissioner*, 8 T.C. 47, 50 (1947). Cf. *Battelstein v. Internal Revenue Service*, 631 F.2d 1182, 1183 (5th Cir. 1980).[17]

---

[16]In *Rubnitz*, a partnership obtained a 25-year, $1,650,000 construction loan. A loan fee of 3½ percent of the principal amount of the loan was payable upon the closing of escrow. The full loan fee was deducted by the lender from the principal amount of the loan upon the closing of escrow. Hence, only the principal amount of the loan minus the loan fee was actually made available for the partnership's use.

In *Heyman*, a partnership arranged for two construction loans. Two so-called "construction loan accounts" were maintained by the partnership with the lending institution. The partnership's right to draw funds from these accounts was based upon levels of construction completed. Monthly interest based on the amount of loan proceeds actually drawn was charged by the lender. Rather than collecting such interest from the partnership, the lender simply debited the construction loan accounts each month for interest charges. The debits reduced the balance of each account subject to withdrawal. Thus, like in *Rubnitz*, only the principal amounts of the loans minus the withheld interest were available for the partnership's withdrawal.

In *Howard*, a partnership obtained a building loan. As in *Heyman* and *Rubnitz*, the lender deducted certain charges, which were claimed by the taxpayer to be interest expenses, from the face amount of the loan. The taxpayer sought to avoid the reasoning of the discounted-loan cases by arguing that, in substance, the funds applied to the charges had been disbursed to the partnership. We rejected this argument on the ground that, even if the amounts applied to such charges had been advanced to the partnership, the partnership would not have obtained unrestricted use of the amounts because the partnership had covenanted to hold each advance in trust "for application to the items for which such advance was requested and approved."

[17]As best as we can understand, if a shopping center checking account had funds derived from rental receipts in it, respondent allowed an interest deduction for each check drawn for interest up to the amount of the rent proceeds contained in the account when the check was drawn and disallowed an interest deduction for the remaining amount of each check drawn. (After having thoroughly reviewed Joint Exhibit 6-F, we are convinced that par. 19 of the stipulation is inaccurate. That paragraph, in relevant part states, "From all interest

In response to respondent's argument concerning FNB's right of setoff, petitioners contend that FNB had no right of setoff because (1) no credit was extended by FNB to Noble and Rutland based upon the faith of deposits on hand, and (2) no debts were past due.

Petitioners' first contention is erroneous because it confuses two remedies that may be available to a bank within the State of Alabama when a debt of a depositor is past due. To justify the imposing of the first remedy, which is known as a "banker's lien," credit indeed must have been given upon the faith of a deposit then on hand. *Get it Kwik of America v. First Ala. Bank, supra* at 571. However, for a bank to invoke the second remedy, referred to as a "right of setoff," it is not essential that credit be extended upon the faith of an amount on deposit. Instead, the availability of the right of setoff is dependent only upon the bank and depositor being in a debtor-creditor relationship and the debts being mutual, that is, between the same parties and in the same capacity. *Atkinson v. Federal Deposit Ins. Corp.*, 635 F.2d 508, 511 (5th Cir. 1981); *Kaufman v. First National Bank of Opp, Alabama*, 493 F.2d 1070, 1072 (5th Cir. 1974).

We think, however, that respondent's emphasis on the right of setoff is misplaced. The power over loan proceeds retained by a bank through a right of setoff is significantly different from the absolute control over loan proceeds retained by a bank in the discounted-loan situation.[18] As petitioners assert, a bank, within the State of Alabama, cannot setoff a fund against a debt of a depositor which has not yet become due. *Bank of Guntersville v. Crayter*, 199 Ala. 599, 75 So. 7, 9 (1917). Thus, FNB had a means by which it could exercise control over only whatever funds Noble and Rutland had in their accounts

claimed on each center, respondent allowed the interest deduction for the gross amount of rental income received on such shopping center.") However, respondent has abandoned ship, stating that the source of the funds used by petitioners to make the payments at issue herein is irrelevant. Consequently, we have not considered whether where loan proceeds are deposited within the lender's domain, as were the construction loan proceeds here, we are required to scrutinize whether the degree of commingling that occurred was sufficient to vitiate the possibility of tracing the loan proceeds to the disbursements made in satisfaction of interest charges. *Burgess v. Commissioner*, 8 T.C. 47, 50 (1947).

[18]Likewise, the right of setoff is significantly different from the trust situation set out in *Howard v. Commissioner*, T.C. Memo. 1977–287 (in which the lender would have retained substantial control over the loan proceeds allocable to interest charges).

maintained with FNB as of the time their debts for periodic interest became due. Since Noble and Rutland were not required to keep construction loan proceeds advanced to them in accounts maintained with FNB, FNB's string attached to the disbursed proceeds by virtue of the right of setoff was at best a tenuous one.

In sum, we conclude that FNB's unexercised right to discount the construction loans and its possible right of setoff do not require this case to be treated like the discounted-loan cases.

We turn next to the question whether each shopping center was financed by a single loan extending over a 23-year period.

Petitioners argue that upon the fundings by the permanent lenders, the related construction loans terminated, and the interest due to the construction lenders on such loans was paid with money borrowed from the permanent lender. Therefore, they further argue that, under the well-settled rule applicable where a taxpayer borrows money from a second lender to pay interest owing to his original lender (see *Crown v. Commissioner*, 77 T.C. 582, 594 (1981)), at the time of the fundings by the permanent lenders, the interest on the construction loans must be considered paid and deductible. Respondent, on the other hand, contends that there was a single loan for each shopping center as evidenced by the single promissory note that the construction lender was required to assign to the permanent lender and that the mere assignment of those notes by the construction lender to the permanent lender was insufficient to bifurcate each of the loans. Respondent further contends that, therefore, the interest must be amortized over the 23-year life of each loan. Since we have found that the commitment fees, which are stipulated to represent interest, were not "paid" within the meaning of section 163, we must resolve this dispute to determine the proper timing of deductions for commitment fees.

In *Lay v. Commissioner*, 69 T.C. 421 (1977), we were presented with a similar construction loan/permanent loan issue. The *Lay* case concerned two limited partnerships, each of which constructed and operated a housing project that met the requirements of section 236 of the National Housing Act. In connection with the financing of each project, a note was executed in favor of a single lender, providing for repayment

within 41½ years, with interest alone payable for the initial 2 years (the construction period) and with payments of interest and principal payable over the remaining 40 years. Although commitments were obtained from the Federal National Mortgage Association (FNMA) to purchase the loan related to each project at completion of construction, the lender for each project chose not to sell its loan either to FNMA or to a secondary mortgagee. In the *Lay* case, we were required to determine the timing of deductions for interest withheld by the lenders during the construction period of each project. The taxpayer argued that, in substance, each project had two separate and distinguishable loans, a permanent loan and a construction loan, or that even if each project was financed by only one loan, then such loan had two separate and distinguishable periods, a construction period and a permanent period. He argued that, in either event, interest allocable to the construction period should have been amortized over such period. In concluding that the interest was required to be amortized over the 40-year life of each loan, we relied upon the following facts: (1) Each partnership had negotiated only one loan covering both construction and permanent financing, and (2) each partnership had directly executed no other mortgage with a secondary mortgagee. *Lay v. Commissioner, supra* at 435–436.[19]

After having found in *Lay* that each partnership had negotiated only one loan, we then noted that what the taxpayer referred to as a second closing was in fact an assignment of legal interest in the payment of money. *Lay v. Commissioner, supra* at 436. That assignment was insufficient to transform the single loan that had been negotiated into two separate and distinct loans. See *Goodwin v. Commissioner*, 75 T.C. 424, 442 n. 13 (1980), affd. 691 F.2d 490 (3d Cir. 1982).

The evidence before us in the instant case calls for a different outcome than was reached in *Lay* and its recent progeny.[20] The focus of our inquiry (as in each of those cases) is whether the taxpayers have engaged in sufficiently separate

---

[19] *Williams v. Commissioner*, T.C. Memo. 1981–643.

[20] *Wilkerson v. Commissioner*, 70 T.C. 240, 261–263 (1978), revd. on another issue 655 F.2d 980 (9th Cir. 1981); *Williams v. Commissioner*, T.C. Memo. 1981–643.

and distinct negotiations for construction and permanent financing, so as to have bargained for, and obtained, separable construction and permanent loans. *Lay v. Commissioner, supra* at 435. See *Buddy Schoellkopf Products, Inc. v. Commissioner*, 65 T.C. 640, 648–650 (1975).

Here, we are convinced that Noble and Rutland negotiated separately for permanent loans and construction loans and obtained two distinct loans to finance each project.

FNB did not agree to supply Noble and Rutland with any funds beyond the construction phase of each project. In fact, FNB could not retain any promissory note beyond the construction phase of the project; by the agreements to assign, it had obligated itself to assign the title and interest in each note to the permanent lender upon completion of construction of the respective shopping center. Cf. *Wilkerson v. Commissioner*, 70 T.C. 240, 262 (1978), revd. on another issue 655 F.2d 980 (9th Cir. 1981). Furthermore, if the permanent lender for any project failed to fund its loan by a date certain set forth in the note, the agreement to assign, and the construction loan agreement pertaining to the project (unless another date was agreed on by the permanent lender and FNB), the construction loan would automatically become due and payable on such date.

Moreover, in the instant case, each note provided that if and when it was acquired by the permanent lender, a change in its terms would take place. Noble and Rutland negotiated the alternate terms separately. Thus, the present case is unlike the *Wilkerson* and *Lay* cases, where even following the assignments of the notes, the borrowers continued to pay principal and interest under the terms negotiated with the original lender. Here, as respondent contends, the permanent lenders, by acquiring the notes by assignment, may have acquired an earlier security interest which would be valuable in a priority dispute with other lenders. However, as we noted in *Wilkerson*, "the proper focus of analysis must be on the [taxpayers] as borrowers." 70 T.C. at 261.[21] Here, Noble and

---

[21]See *Austin Co. v. Commissioner*, 71 T.C. 955, 965 (1979), in which a corporation deducted nonrecurring recording and attorney fees paid for its lender's filing of financing statements in the year the fees were paid, where we stated "petitioner is correct in that the loan expenses must be amortized over the period of the loan and not the period of the financing statement or security agreement."

Rutland obtained FNB's obligation to supply them with funds during only the construction period, and we think that the interest and fees were intended to compensate FNB for the use of its money during that time.

In accordance with the foregoing, we conclude that two separate loans existed. Accordingly, the commitment fees representing interest on the various construction loans are deemed paid as of the time of the fundings of the respective permanent loans.

Respondent determined that the amount of $6,349.25 deducted by Mr. and Mrs. Noble for construction loan legal fees on their 1974 tax return is amortizable over a 23-year period. However, the parties now agree that the fees are amortizable over the construction period, if we find that each shopping center was financed by two separate loans. Since we have so found, the construction loan legal fees are to be amortized over the lives of the construction loans from FNB.[22]

*Decisions will be entered under Rule 155.*

---

[22]Although admittedly this results in legal fees being treated differently from interest, well-established rules impel the different conclusions. We have consistently held that fees paid for services in obtaining a loan are in the nature of capital expenditures, which must be amortized over the life of the loan. *Enoch v. Commissioner*, 57 T.C. 781, 794 (1972); *Harman v. Commissioner*, 4 T.C. 335, 348 (1944); *Lovejoy v. Commissioner*, 18 B.T.A. 1179, 1182 (1930). On the other hand, petitioners, as cash basis taxpayers, are not entitled to a deduction for interest until it is "paid." Sec. 163.