19 N.J. Super. 255 (1952)
88 A.2d 342
ARMAND CUSANO AND LOUIS CUSANO, PLAINTIFFS-APPELLANTS-RESPONDENTS,
v.
PAUL CUSANO, DEFENDANT-RESPONDENT-APPELLANT, AND TERESA CUSANO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1952.
Decided April 25, 1952.
*258 Before Judges EASTWOOD, BIGELOW and FRANCIS.
Mr. Samuel Milberg argued the cause for the plaintiff, Armand Cusano (Messrs. Milberg & Milberg, attorneys).
Mr. Samuel H. Nelson argued the cause for the plaintiff, Louis Cusano.
Mr. Isadore Glauberman argued the cause for the defendant, Paul Cusano (Mr. Samuel J. Davidson on the brief; Messrs. DeFazio, Davidson & DeFazio, attorneys).
Mr. Benedict A. Beronio, attorney for the defendant, Teresa Cusano.
The opinion of the court was delivered by FRANCIS, J.C.C.
The plaintiffs here are members of a limited partnership doing business under the trade names of American Cabinet Company, American Shuffleboard Company, and American Cabinet & Billboard Company. The defendant, Paul Cusano, is their brother, and defendant, Teresa Cusano, is their mother. In July, 1950, plaintiffs instituted this action seeking a dissolution of the partnership, appointment of a receiver to wind up its affairs, an accounting *259 by the defendant, Paul Cusano, and certain interim restraints against him. Teresa Cusano was made a defendant only because she declined to act as a plaintiff and so that her interests as a partner could be controlled by the judgment of the court. Defendant Paul Cusano counterclaimed, seeking an injunction against plaintiffs to prevent them from interfering in the operation and management of the business.
On August 21, 1950, following the filing of an amended complaint, a custodial receiver was appointed for the partnership, and defendants were ordered to show cause one week later with respect thereto and the merits of the action. Thereafter, on August 26, 1950, on the written consent of all parties the receiver was authorized to operate the business "in all respects as the business had heretofore been conducted by the said partnership, prior to the date of his appointment."
After taking testimony for two days, September 26 and 27, 1950, on the order to show cause, and prior to the next hearing date, on proper notice to all parties, the court discharged the receiver, restored the business to the defendant, Paul Cusano, and dissolved the restraints.
At the conclusion of protracted hearings which, as indicated, began on September 26, 1950, and terminated on February 13, 1951, the trial court dismissed the complaint and the counterclaim. Thereafter the receiver was allowed $5,000 as compensation for his services, to be paid out of the partnership, and J.C. Abramson & Company, one of two accountants appointed by the court on the application of the receiver, was awarded $1,800 for its services. This fee was ordered paid in the first instance by the partnership but to be charged against the plaintiffs in the taxed costs.
By this appeal plaintiffs seek a review of the dismissal of their complaint and of the allowance of the $1,800 accountant's fee against them. Defendant Paul Cusano appeals from so much of the judgment as charges the receiver's allowance of $5,000 against the partnership.
For some years prior to December 31, 1949, the defendant Paul Cusano had been engaged in the manufacture and sale *260 of billiard and pool tables, shuffleboards, bar fixtures, and like articles. In December, 1943, he was about to marry. His brother, Armand, was doing defense work in a shipyard and Louis was in the Army. Their mother, undoubtedly influenced by the impending marriage, asked Paul to give her and his two brothers a 50 per cent interest in the business. For the years 1941 and 1942 the financial record of its operations shows that the sales for 1941 amounted to $47,191 and the net profit was $3,778.40; for 1942 the sales totaled $100,177.51 and the profits $9,378.56. Paul must have known at this time that business was improving because the sales for 1943 were $213,846.21 and the net profits were $45,203.29. However, it seems unlikely that any of the parties considered this as presaging the success which followed.
In any event, Paul yielded to his mother's wish and agreed to give each of the three a 16-2/3 per cent share so that they would have a combined interest of 50 per cent and he would retain a like interest. However, he imposed the condition that he would retain unqualified control over the operations, that his brothers would not interfere with his management, and that if they began to work actively in the business, they would act as, and accept treatment as, ordinary employees.
An agreement of limited partnership was drawn by attorneys representing the parties, which specifically embodied their understanding. It provided that the partnership was to continue for 30 years beginning January 1, 1944; that Paul would have the full and complete right to manage the business, without interference from the brothers or their mother; that Paul was to be considered the employer and whenever in his discretion it appeared to be for the good of the business to terminate the employment of any of the partners, such termination would be final and beyond question; and that Paul would render an accounting of the partnership business to them semi-annually and would pay to them out of the profits such sum as he deemed proper to disburse. It further provided that proper books of account would be kept by Paul, that they would be open for inspection at all reasonable *261 times, and that the limited partners would have the right to have them audited, at their own expense, by an accountant of their choice. Certain patents owned by Paul were to continue in his ownership, but the partnership was licensed to manufacture and sell the patented articles for the term of the agreement.
The partnership started out with capital of $18,204.03 which was allocated to it by Paul. The books noted the ostensible contributions as Louis, Armand and the mother, $3,040.67 each and Paul $9,122.02. Actually Louis and Armand made no contribution. An effort was made at the hearings to establish some pre-existing obligation running from Paul's business to them, but no substantial evidence of any legal liability was adduced. Mrs. Cusano held Paul's note for $4,500 and under the contract she not only received the financial interest as above set forth but also a further assignment of $3,000 to be withdrawn at the pleasure of the parties, when the cash was available.
Armand did not come to work for the partnership until early in 1945; Louis came toward the end of January, 1946. Armand quit around Thanksgiving, 1948, and Louis was discharged March 24, 1950.
The success of the partnership was little short of phenomenal. The books show the following:

 Sales Net Profits
 1944 $320,914.74 $71,204.67
 1945 $423,146.07 $69,237.28
 1946 $762,175.79 $126,311.99
 1947 $998,670.35 $199,553.23
 1948 $1,883,904.16 $372,576.72
 1949 $2,075,425.32 $249,199.72

These net profits were not distributed. They were retained in the business and used for its improvement and expansion. However, the share of each partner was credited to his capital account on the books of the company.
*262 With respect to Paul's salary the agreement provided that he should be paid $100 a week so long as the volume of business approximated $170,000 annually. Then for each $10,000 increase in volume he would receive an additional $5 weekly. The manifold increase in his weekly earnings through the application of this scale to a sales volume such as that in 1949, for example, in excess of two million dollars, is readily apparent.
From the inception of the partnership the federal income tax on both the wages and accrued profits was paid for all the partners out of the business.
Success brought not peace but discord among the brothers. While the evidence is somewhat conflicting as to the origin and source of the trouble, the conclusion reached by the trial Court is inescapable that despite their solemn written compact under which they were to be employees, Armand and Louis grew to resent the need for punching the time clock and bowing to Paul's authority. They became jealous of him and demanded some executive authority for themselves. When it was not forthcoming and when the profits continued to go back into the business, the bitterness engendered eventuated in Armand's resignation, in the discharge of Louis, and in this and other litigation.
Prior to Armand's departure, he and Louis learned that the method employed by Paul in the payment of their income tax obligations had created an unbalance in the respective capital accounts of the partners. It came about in this way: Paul had a 50 percent interest in the business. Since the net profits were not being withdrawn, the balance in his capital account at any given time should have equalled the total of his partners' balances. However, because of his 50 percent interest his income tax liability was much greater than that of any one of the other partners. When the firm paid the taxes Paul simply reduced the sum credited to his capital account by the difference between the amount paid for him for that purpose and that paid for each of the other partners. Thus Armand, Louis and their mother were being *263 required to leave all their shares of the profits in the business while Paul was using part of his to pay taxes.
In June, 1949, the three limited partners instituted an action against Paul in the Chancery Division of the Superior Court in which they sought an accounting, not only because of the income tax situation but also on an allegation that since the formation of the partnership he had taken and appropriated moneys from the funds and profits of the partnership for his own personal use without paying over to each limited partner his or her proportionate share thereof.
On January 23, 1950, the action was settled through an agreement by Paul to pay into the partnership $70,114.59. According to Paul this payment was supposed to settle all the differences then existing between himself and his partners in connection with his management of the partnership affairs. However, at the hearing of the action now under consideration the brothers took the position that only the income tax problem was disposed of.
In any event, upon consummation of the settlement Armand was paid $23,374.66 and Louis $21,375.93, and the capital accounts were equalized. As the result of this equalization, on July 31, 1950, the total net profit which had been added from January 1, 1944, to the capital account of each partner was as follows:

 Paul $598,680.90
 Armand 199,536.29
 Louis 199,536.31
 Mother 199,536.29

But this did not case the discord. Thereafter they wrote to and visited the Collector of Internal Revenue, charging that Paul had been using partnership materials, employees and funds for his own purposes and not reporting such use as income, and that he had sold partnership equipment and converted the money to his own use. These complaints resulted in investigation by the department but no assessments against Paul. According to Paul, Armand threatened to *264 ruin him and Armand admitted that he told persons with whom the partnership did business that Paul was a thief.
At the hearing Paul testified that this continued course of conduct almost drove him to distraction and he decided that dissolution was the only way out. He consulted an attorney in March, 1950, and such a complaint was prepared. It seems apparent that Mrs. Cusano was endeavoring to remain neutral and to eliminate the discord among her sons. When Paul told her of his proposed dissolution action she asked him for a copy of the complaint to show his brothers in the hope of persuading them to make peace. This was done and the complaint was exhibited to them. Plaintiffs insist that the intervention of the mother at this point was not to seek an amicable understanding but rather that she was being used by Paul to show them the complaint as part of his plan of psychological coercion to force them to sell their interests to him at an inadequate price. The trial court found that the mother was using the complaint in good faith for the purpose of avoiding litigation, and the facts and circumstances completely justify that conclusion.
In any event, when Paul did not hear from his brothers he decided that it would be a foolhardy and unwise act to seek a dissolution, which could result only in financial loss to everyone. Consequently the complaint was never filed. Thereafter he continued in the regular operation of the business. In fact, at about this time and down to June 2, 1950, because of a shortage of cash he and his wife borrowed a total of $30,000 from a local bank and loaned it to the firm.
Thereafter, in July, 1950, this action for dissolution and accounting was brought by the plaintiffs.
At the hearings plaintiffs predicated their claim for dissolution on a number of factors, these being the principal ones:
(1) The unbalance in the capital accounts of the partners caused by Paul's method of handling the income tax payments (which inequality had been rectified through their earlier action).
*265 (2) The improper use of partnership employees for work around and in Paul's home and on personal errands for him while such employees were being paid by the firm.
(3) The improper use of certain materials of the partnership in connection with a playroom in the cellar of his home.
(4) The alleged conversion of cash realized from certain sales of equipment and materials.
(5) The payment of certain bonuses to one Juliano, an independent contractor for the partnership.
(6) Failure to pay out the net profits to them.
(7) Alleged misrepresentation of the 1949 inventory.
(8) The abortive complaint for dissolution.
There does not seem to be much dispute in connection with the charge that in 1948 Paul used the firm's employees to do some work around his home and its grounds and to drive his wife to the doctor's office, and that he used some partnership-owned materials and supplies in a recreation room in the basement of his home. He said that the employees' time and materials used, which were not charged against his drawing account, were worth about $250. While the record does show that work done by some employees in the amount of $388.32 was charged to his drawing account, judging by the number of employees who worked there and whose time does not appear to be included in the $388.32, it seems likely that the $250 figure is inadequate. However, the evidence shows clearly that the recreation room, in which were installed one or two shuffleboards, was employed in part by Paul for advertising purposes. Some pictures taken there were used in the magazine section of the New York Herald Tribune and in other media of advertising. While there is an element of impropriety about Paul's conduct on this phase of the case, we must agree with the trial judge that it scarcely provides a basis for a judgment of dissolution.
With respect to the alleged appropriation of monies resulting from certain sales, the two largest of these items were certain billiard tables and a bar. The billiard tables were sold by Paul in 1947 for $1,500 and he asserted that the *266 money was divided proportionately among the partners. Armand and Louis denied it. However, Paul was corroborated by a witness, who testified that he arranged the transaction and was paid $50 for his services by Armand.
The bar was sold for $750 and Paul took the money because it belonged to him, the bar never having been a partnership asset. We are not persuaded that plaintiffs proved the contrary.
A few other alleged cash sales were criticized by the plaintiffs. Some of them, over-the-counter transactions for small amounts of material, were conceded by Armand to be trivial. But trivial or otherwise, no satisfactory proof of the taking by Paul was adduced.
It is undisputed that in 1948 a so-called independent contractor, one Juliano, was paid a bonus of $2,000 and one of $1,500 in 1949. These bonuses were shown on the books as "Miscellaneous repairs" and "Special emergency service in effect for 1948 only." By way of explanation Paul said that Juliano was a repair and maintenance man and one of the most important men in his organization, and that he had been saved thousands of dollars over the years through Juliano's efforts. For these reasons the bonuses were given. He, as well as Juliano, denied the plaintiffs' assertion that there was a kickback to him from this money, and no proof was offered in support of the charge beyond an argument based on the ambiguous notations on the firm's books. Bonuses given in good faith and without impairment of the financial condition of a business must be considered a prerogative of management.
Much stress has been laid upon the charge that the general partner misrepresented the 1949 inventory. This inventory as of December 31, 1949, was fixed at $92,457.56 and it appeared in the statement furnished to the limited partners on March 15, 1950. Armand said that as soon as he saw the figure he knew it was too low and was "false." And he did not rely on it at all as being correct. On the other hand, Louis testified that the first time the inventory figure ever *267 came to his attention was in the courtroom during the hearing.
It is argued that Paul deliberately made the inventory low so as to assist him in his efforts to buy out the interests of the partners. Aside from the fact already noted that one brother placed no reliance on the inventory and the other was unaware of it, the inventory for this year was taken by precisely the same method as in previous years. Employees were assigned to count the inventory in the plants. When this was completed the record sheets were delivered to Paul who fixed the values on the basis of "cost or market value whichever was lower." The various procedures which were followed in reaching the values were probably not the most precise or scientifically accurate. Paul said frankly: "In determining the value of the inventory I have always borne in mind the fact that I should make the figure as low as possible consistent with legal technicalities  I mean Internal Revenue  and its fairness to the true value of the item * * *." Further, he felt that the inventory was not of major importance "because whatever was there was there."
There is no evidence that a complaint or criticism was registered by either brother about the same type inventory for any previous year. Nor is there any proof of misuse or diversion of inventory, except perhaps, for the unspecified but obviously unsubstantial amount of materials used in Paul's playroom. Likewise the Internal Revenue Department does not seem to have interfered, despite the informer methods employed by Armand and Louis.
Although the plaintiffs made elaborate efforts to construct a much higher inventory for 1949, study of the whole evidence on the subject is convincing that Paul acted in good faith and that no substantial harm came to the partnership as the result of his conduct with respect thereto. Also it cannot be overlooked that under the terms of the partnership agreement plaintiffs had the right "at all reasonable times" to engage their own accountant for purposes of auditing the books. However, they never took advantage of this contractual *268 right until, at their request in this proceeding, the receiver secured the appointment of an accountant.
Much stress is laid upon the preparation by Paul of the unfiled complaint for dissolution. Plaintiffs charge that it and some correspondence emanating from Paul on the same topic constitute such an anticipatory breach of the partnership agreement as justifies them in treating it as terminated and in seeking a judgment of dissolution. No such drastic consequences can be attached to this course of conduct. The exhibition of the complaint to the brothers in the hope that it would serve to bring them to their senses and produce peace in the management of the business, and without ever giving the complaint actual significance by filing it and thus commencing an action, cannot have any substantially adverse effect on the general partner's present position. While some of the allegations of the complaint may have overstated the pertinent facts with respect to the condition of the business, no actual prejudice or damage resulted to the plaintiffs thereby. They always had the right to inspect the books before selling out to Paul and thus determining the true financial condition of the business.
Plaintiffs' amended complaint avers that Paul failed to distribute profits of the partnership "sufficient at least to cover the amount of income taxes due by each of said plaintiffs to the United States Government." However, the record shows that, aside from wages and sums paid for income taxes, each limited partner received from the firm through 1950 the following amounts:

 Louis $47,864.42
 Armand $53,864.24
 Teresa $47,864.42

Income taxes in these amounts were paid for each of them by the firm during the same period:

 Armand $94,356.54
 Louis $95,500.27
 Teresa $92,644.85

*269 The remainder of the profits, except for some small amounts, were retained in the business. In this connection the partnership agreement provides that the general partner will pay out of the profits "what the general partner deems safe and proper to disburse therefrom at such time." No substantial evidence was introduced to show either an abuse of this discretion or misuse of the undistributed profits.
Two other matters were advanced below against Paul; one had to do with a payment of a balance of $130 due on the sales price of a rebuilt shuffleboard; the other, with two checks given by the partnership to Armand, one for $500 and one for $300, both of which he received and cashed. The trial judge found no sufficient proof of any wrongdoing in connection with them and the record does not justify a contrary conclusion.
On the whole case the picture presented is that of a healthy, successful, going business, which has multiplied many times the original book contribution of $3,000 of each limited partner. The few irregularities that Paul has been guilty of have not prejudiced the operations nor do they establish any substantial breach of the duty of good faith that he owed and owes to his limited partners. The root of the trouble seems to rest in the disinclination of the plaintiffs to abide by the terms of their own agreement. The understanding was and still is that Paul should have sole control over the management of the business throughout its 30 year life. They must adhere to that undertaking so long as Paul acts in good faith with respect to it. Their rights are measured by their written compact; the success of the enterprise neither increases nor decreases those rights. Their restricted position as limited investors is protected through the stipulation for reasonable audit of the books. The fact that they never sought that inspection, even during the years of dissension, is some indication that their main interest is in obtaining what they are not entitled to under the agreement, namely, some executive authority over the business.
There is no doubt that under the general equity power *270 dissolution of a limited partnership can be had for fraud or other misconduct of a general partner (68 C.J.S., sec. 488), or for the doing of any act which would make it impossible to carry on its ordinary business (R.S. 42:2-13b). It is inconceivable that R.S. 42:2-20 (4a and b) was intended to limit specifically the right to dissolution to cases where: (a) the limited partner rightfully but unsuccessfully demands the return of his contribution, or (b) the other liabilities of the partnership have not been paid, or the partnership property is insufficient for their payment as required by the Uniform Limited Partnership Law, and the limited partner would otherwise be entitled to the return of his contribution. In any event, we agree with the trial court that the evidence here is not adequate to establish such breach of faith, fraud or mismanagement of the partnership affairs as to require or to justify dissolution.
Plaintiffs protest the failure of the trial court to allow certain questions which were put to Paul Cusano on cross-examination. These questions inquired as to whether or not he had completed the December 31, 1950, financial statement, or had received such a statement from his accountant, and whether it showed a profit or loss as of that date.
The propriety of this evidence is urged on two grounds: first, a comparison of the inventory figures contained in the 1950 statement with the challenged 1949 inventory might provide a basis for demonstration of the soundness of plaintiffs' criticism of the 1949 inventory; second, in an equity suit seeking dissolution, inquiry should be permitted into the affairs of the partnership down to the time of trial. So they contend that evidence should be admitted showing a loss for the year 1950.
As already indicated, plaintiffs have magnified the importance of the 1949 inventory out of all proportion to its bearing on the issues in the case. We have concluded that plaintiffs failed to establish any damaging effect on the affairs of the partnership or on the interests of the individual members through the 1949 inventory. The possibility that *271 the 1950 inventory figure might throw some further light on the 1949 situation  and there was no offer to prove what the actual 1950 figure was  opened an avenue of speculation which the trial court was justified in declining to explore.
Nor do we think error was committed in disallowing the inquiry with respect to the loss or profit statement as of December 31, 1950. Since the record discloses no reasonable basis for ordering dissolution, the fact that some loss was sustained in 1950 would not, even if added to the sum of the plaintiffs' proof, alter this determination. Further, it must be kept in mind that 1950 saw the receivership, the insecurity produced by this litigation, and the admitted maligning of Paul Cusano in the trade by at least one of his brothers. Consideration of all of the circumstances impels the conclusion that plaintiffs were not prejudiced by the rejection of this evidence.
In this same connection plaintiffs sought and were denied a new trial on the ground of newly discovered evidence. The new evidence was said to be the financial statement of December 31, 1950, which was delivered to them subsequent to the adverse judgment herein and which is said to show a loss for the year 1950. Failure to grant a new trial is likewise charged as error.
In instances where the evidence meets the test of not having been available originally, new trials are not granted unless the proof is of such character as would probably have produced a different result at the trial. Cumulative proof would not suffice. Rule 3:60-2; Federovitch v. Pantasote Leather Co., 123 N.J.L. 510, 9 A.2d 799 (Sup. Ct. 1939); Fulmer v. Equitable Life Assurance Society, 14 N.J. Misc. 407, 185 A. 474 (Sup. Ct. 1936); Paradise v. Great Eastern Stages, 114 N.J.L. 365, 176 A. 711 (E. & A. 1935); Richardson v. Hatch, 68 N.J. Eq. 788 (E. & A. 1905). Evidence of an operating loss suffered by the partnership in 1950 does not carry the required probative force.
Coming now to the question of the allowances of the receiver and the accountant, Abramson. Defendants say that *272 the receiver's allowance of $5,000 should have been assessed against the plaintiffs because their action was dismissed and Paul Cusano's administration vindicated.
A completely wrongful and unjustified receivership action undoubtedly would provide a basis for assessment of costs against the instigators rather than the victim of the litigation. Greenbaum v. Lafayette & Broad Realty Corp., 97 N.J. Eq. 536 (E. & A. 1925). However, all parties in this cause consented to the order under which the custodial receiver operated the business. Paul maintains in his brief that to prevent a destruction of the business, his attorneys prevailed upon the custodial receiver to continue to operate it. However, after two of the fourteen hearing days he was able to obtain the discharge of the receiver.
In any event, dismissal of receivership proceedings, of itself, would not require or justify assessment of allowances against the persons who initiated the action. If any reasonable grounds for the belief by the plaintiffs that such action was justified are shown by the record, then assessment of incidental costs may be made properly against the business, even though the belief, when subjected to the impact of all the facts and circumstances, turned out to be erroneous. In appraising the reasonableness of the belief, consideration must be given to the persons involved, their business capacity and the situation in which they found themselves at the time when they acted. They had discovered the unbalance in the capital accounts because of the income tax payments and Paul had yielded in this field of criticism to the extent of repaying in excess of $70,000; they knew he had used firm equipment and materials in his private affairs, at least to some extent; the bonus payments to Juliano had not been explained to them; they had received letters from Paul requesting capital contributions and disparaging the future outlook of the business, and they were permitted to examine the draft of Paul's complaint seeking dissolution. They were not experienced business men; they were upset, albeit largely through their own jealousy and unfair conduct, and they *273 were suspicious that their substantial capital accretions were in jeopardy. That they could have resorted to the contractual right of obtaining their own audit of the books is not dispositive of the problem. A critical evaluation of all the circumstances and equities leads us to the conclusion that the trial court did not act without legal justification in placing the receiver's allowance where its burden would fall on all the parties, that is, on the partnership.
As to the $1,800 accountant's allowance, the positions of the parties are somewhat different. Although plaintiffs at their own expense could have had an accountant audit the books at reasonable intervals, they never did so. The accountant, Abramson, was appointed by the court on the receiver's application. However, the receiver, as his petition plainly shows, was influenced to seek the appointment because of the charges by the plaintiffs and their attorneys. After the order was signed designating two accountants, Abramson, one of them, was assigned to investigate plaintiffs' charges of diversion and misuse of assets prior to the date of the receiver's appointment. His entire work was devoted to such investigation and he found no support for their position. In addition, the various items, which have already been discussed at length, about which there is some aura of impropriety, such as, the income tax problem, use of partnership employees and materials by Paul individually, etc., were all known to plaintiffs before the accountant was installed. If they had exercised their contractual right to have an audit, the expense would have fallen upon them. The fruitless investigation to which they put the receiver's accountant should not leave them in a better position as to the expense he incurred thereby. The allowance to the accountant, Freund, whose efforts really served the receiver, was imposed upon the partnership. Therefore, Abramson's award, and the costs of the action as well, were justifiably imposed upon the plaintiffs.
For all these reasons the judgment of the Chancery Division is in all respects affirmed.