NORMAN W. MENZ AND MARJORIE MENZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 19179–80.     Filed June 29, 1983.

---

[4]References to Rules refer to the Tax Court Rules of Practice and Procedure.

[5]*Sherman v. Commissioner,* T.C. Memo. 1982–582.

*John W. Adams*, for the petitioners.
*Richard J. Sapinski*, for the respondent.

DAWSON, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1971 | $17,370 |
| 1974 | 10,019 |
| 1976 | 6,412 |

The deficiencies result from respondent's disallowance of petitioner Norman Menz's allocable share of partnership losses in the years 1974 and 1975. The sole issue for decision is whether that partnership "paid" interest within the meaning of section 163(a)[1] through a series of wire-funds exchanges between separate bank accounts of the partnership and its lender.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioners Norman Menz and Marjorie Menz, husband and wife, resided in North Caldwell, N.J., at the time of the filing of their petition herein. Petitioners timely filed their calendar year Federal income tax returns for the years 1971, 1974, 1975, and 1976 with the Internal Revenue Service Center at Philadelphia, Pa. Petitioners used the cash method of accounting.

During the years 1973 through 1978, petitioner Norman Menz was a limited partner in Rockaway Center Associates (hereinafter RCA), a New Jersey limited partership formed in

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

September 1973. During the years in question, the partners and their corresponding percentage interests in RCA were as follows:

*General partners*

| Name | Percentage interest |
|------|---------------------|
| Irwin Blitt .............................. | 0.01 |
| Paul Copaken ........................... | 0.01 |
| PPI, Dover Corp ........................ | 1.00 |

*Limited partners[2]*

| | |
|------|---------------------|
| Irwin Blitt .............................. | 26.33 |
| Paul Copaken ........................... | 26.33 |
| Lewis White ............................. | 26.31 |
| Norman W. Menz ....................... | 20.01 |
| | 100.00 |

RCA timely filed Form 1065 partnership returns for each of the years 1974 through 1977, and reported its income and deductions in accordance with the cash method of accounting.

## The Financing Agreements

RCA was organized as a successor in interest to Copaken, White & Blitt, Inc. (hereinafter CWB), a real estate development corporation whose principal offices are located in Shawnee Mission, Kans. RCA was to construct a shopping center on approximately 200 acres of land in Rockaway Township, N.J. That land had been purchased by CWB in July 1972 as part of a joint venture with Corporate Property Investors (hereinafter CPI). CPI is a Massachusetts real estate investment trust whose principal activity is investing in income producing properties. CPI's main offices during the years in issue were in New York, N.Y.

CPI's arrangement with CWB was to provide a construction development loan. The main purpose of such a loan is to fund the acquisition of land and payment of development costs (including architect's fees and site borings) in order to prepare

---

[2]The parties do not elaborate upon any significant ramifications caused by Irwin Blitt's and Paul Copaken's contemporaneous designation as both limited and general partners. See N.J. Rev. Stat. sec. 42:2–16 (1953). Since such information is unnecessary to resolve this case, we need not consider the point.

the subject property for construction and in anticipation of a new lender making a full construction loan.[3] As of September 1973, CWB had borrowed approximately $3,360,000 from CPI pursuant to the loan and development agreement.

When RCA was formed, CPI, CWB, and RCA (as successor in interest to CWB) entered into a finance agreement under which RCA was to continue the initial development of the proposed site and CPI would provide the funding necessary to do so. Under the finance agreement, RCA also covenanted to pay to CPI the $3,360,000 loaned to CWB under the loan and development agreement. CWB in turn assigned to RCA all of CWB's interest in the shopping center.

Between September 1973 and May 1975, CPI made further advances to RCA pursuant to RCA's requests. The balance due in May 1975 under both the loan and development agreement and the finance agreement was approximately $6,800,000. RCA and CPI then revised the terms of the finance agreement and entered into a construction loan agreement. Under the latter, CPI would make further advances to RCA (limited to an additional $3,200,000 to finance the initial construction phase of the shopping center. In light of this financing provision, RCA executed in May of 1975 a note payable to CPI in the face amount of $10 million. The note was secured by a $10 million mortgage in favor of CPI. The note was subsequently revised, but the principal amount remained the same.

Pursuant to the terms of the note and the construction loan agreement, CPI made further advances of funds to RCA in 1975 and 1976. RCA used up approximately its entire line of credit with CPI during that period.

---

[3]As background information, many different agreements take place in the financing of shopping-center construction. Generally, a promoter (usually affiliated with the developer) first determines a suitable location and then contacts prospective tenants. If the response is favorable, the promoter will acquire financing and begin the project by purchasing the necessary land, rights, etc. This was CWB's relationship with CPI. Once acquired, the developer obtains temporary financing and begins development until a construction-period lender is located. The construction-period lender normally lends only for the construction period (usually 1 to 2 years). Upon completion of the center, a "permanent" lender will purchase the obligation owed to the construction lender and provide long-term financing (30 to 40 years) at generally a lower interest rate than that charged during the construction period. All of the loans are secured by liens on the shopping center property and materials. See *Noble v. Commissioners,* 79 T.C. 751 (1982).

On all loans from CPI, the rate of interest was set at a specified number of percentage points above the "prime"[4] rate charged by a New York bank, with the actual rate to fluctuate along with that base rate.

In May 1976, RCA entered into a building loan agreement with Chemical Realty Corp. (hereinafter CRC) whereby CRC agreed to advance up to $22,500,000 to fund the cost of completing the site preparation work and to commence construction.

## Payment[5] of Interest

The mechanics whereby RCA obtained funds from CPI under the various financial agreements affect whether or not RCA qualifies as having "paid" interest during the years in question.

The normal practice in some construction projects is for the lender to disburse loan proceeds upon receipt of a request from the borrower to enable the borrower to pay itemized bills. Before this would occur, the lender first reviews the appropriateness of the request. In the instant case, RCA was required under its financing agreements with CPI to prepare an annual estimated budget each year and forward it to CPI for approval. During those years, CPI would compare each request with the estimated budget amount and then, after approval, disburse the requested funds.

The loan and development agreement negotiated between CWB and CPI contained the following provision for the payment of interest:

> Section 3.05 *Term, Interest, Payment of Loans by the Trust.* Except as provided in paragraph (b) of this Section 3.05,
> (a) all loans made by CPI as provided in * * * this agreement shall mature three years from the date the title to the land is acquired * * * . Interest shall accrue and be payable when the loans are due, unless the construction Mortgage Financing or the Permanent Mortgage Financing is sufficient to permit payment of accrued interest.

---

[4]The prime rate is normally the rate of interest charged by a bank on 90-day loans to substantial commercial borrowers.

[5]The use of the word "paid" in the findings of fact is for narrative convenience only and is not intended to represent any factual conclusion, which is at issue herein.

Under the finance agreement between CPI and RCA, though, a reserve was established to fund the estimated interest accruing on the loan. This reserve was to be part of the overall $10 million ceiling amount to be lent to RCA by CPI.

CPI was to receive satisfaction for these loan and reserve amounts out of the funds advanced from the construction mortgage financing (if available) or the permanent mortgage financing. Payment was to be made on December 31, 1977, or on the completion of the shopping center, whichever date occurred first.

CPI is an accrual basis, calendar year taxpayer. CPI calculated and recognized as income for both financial and tax reporting purposes the amount of interest accruing each month on the loan balance due from RCA (and previously CWB). For the year 1973, this amount totaled $407,436.99. CPI never billed RCA for any of this interest which CPI was accruing as income.

## 1. The 1973 Transaction

Between September 1973 and December 26, 1973, CPI made additional advances to RCA. On December 26, 1973, the total outstanding amount owed to CPI by RCA was approximately $3,500,000. On or about that date, RCA requested a $432,654.57 advance from CPI for expenses to be incurred during the period December 10 through 31, 1973. The request was itemized as follows:

| | |
|---|---:|
| Interest to CPI through 11/30/73 | $432,266.00 |
| Mtg. rents, through 12/31/73 | 300.57 |
| Maintenance and insurance | 88.00 |
| Total | 432,654.57 |

The $432,266 portion represented the amount of interest accrued but unpaid on the loans CPI made to RCA and CWB between July 1972 and November 30, 1973.

Pursuant to the advance request, CPI made a wire-funds transfer of $432,654.57 to RCA's account at the Baltimore Bank & Trust Co. in Kansas City, Mo. RCA wired back that

same day (Dec. 26, 1973) $432,266 to CPI's account at First National City Bank (FNCB) in New York, N.Y.[6] RCA's retransmission was made in accordance with an understanding between itself and CPI that the funds advanced would be immediately returned to pay the accrued interest amount. CPI recorded the wire transfers between itself and RCA on a single journal entry form as follows:

|  | Debit | Credit |
|---|---|---|
| Mortgage receivable— | | |
| Copaken, et al | $432,654.57 | |
| Accrued interest receivable | | |
| Copaken, et al | | $432,266.00 |
| Cash—FNCB | | 388.57 |

To record advance pursuant to mortgage and receipt of interest on loan to 11/30/73.

The December 26, 1973, advance had the effect of increasing the loan balance from about $3,500,000 to $3,900,000.

## 2. The 1974 Transaction

CPI thereafter made further periodic advances to RCA when requested. As of December 1, 1974, the then-current loan balance, including the December 26, 1973, advance for interest, stood at approximately $4,350,000. The accrued interest from November 30, 1973, to December 1, 1974, was $631,713.77. RCA had previously been advanced $100,000 by CPI for normal business purposes on December 20, 1974.

Mr. Jack Fingersh, vice president of CWB,[7] sent the following letter dated December 27, 1974, to CPI regarding interest accrued on the loan between December 1, 1973, and August 31, 1974:

Gentlemen:

We hereby request you to advance $461,378.00 to the account of Baltimore Bank and Trust Company at Chase Manhattan Bank, New York, New York

---

[6]The notices provided by that bank to its client CPI indicate that the crediting of its account took place on Dec. 26, 1973, at 4:06 p.m., while the debiting of the account was dated Dec. 27, 1973. The parties agree, however, that the dates and the times as set out in the text are the correct representation of the transactions.

[7]Though released from their prior commitments to CPI, CWB remained quite involved with the project because Messrs. Copaken and Blitt were the managing partners of RCA.

* * * on December 27, 1974. This amount represents accrued interest on mortgages held by you for the period ended August 31, 1974. Such interest will be paid to you, pursuant to your instructions, by federal funds wire transfer to your account at Chemical Bank * * *

That same day, a simultaneous wire-funds exchange similar to the December 26, 1973, transaction took place. CPI wired $461,378 to RCA's account at the Baltimore Bank & Trust Co. Later that afternoon, CPI received through wire transfer to its account at Chemical Bank the exact same amount from RCA. As a result of this advance, the loan balance increased to about $4,900,000.

Some of the 200 acres which RCA acquired had been previously used as residences by the former owners. RCA, prior to the site clearing, rented a few of these properties to residential tenants at nominal monthly sums. Such rents represented the majority of RCA's income from sources other than CPI during the years in question.

Prior to the receipt of the CPI funds requested by Mr. Fingersh, RCA's balance at Baltimore Bank & Trust Co. was $17,446.93. Of that amount, RCA had already written approximately $13,000 worth of checks that had not yet cleared. Of the remaining $4,446.93, only approximately $2,200 can be traced to funds which had not been advanced by CPI. RCA had insufficient assets other than the land and buildings acquired for the shopping center with which to pay the interest owing to CPI.[8]

RCA reported a net loss for its 1974 taxable year of $617,245. Contributing to this amount was a claimed deduction for interest expense of $483,726, of which $461,378 represented the amount wired to CPI in the December 27, 1974, transaction. Respondent disallowed the latter amount in his notice of deficiency.[9]

Petitioner Norman Menz included his allocable share of RCA's 1974 loss in determining his and his wife's joint taxable income for 1974. Petitioners claimed a net operating loss of $50,130 in 1974, which loss was carried back to their taxable

---

[8]The value of RCA's land and buildings exceeded $3,500,000. However, effectively all of RCA's property was purchased with money advanced from CPI and was at all times subject to a first lien (in favor of CPI) in excess of the properties' fair market value.

[9]The record does not indicate why the 1973 transaction was not challenged.

year 1971. A refund in the amount of $17,370 was paid to petitioners as a result of the carryback.

## 3. The 1975 Transaction

Between December 27, 1974, and May 11, 1975, CPI advanced additional funds, pursuant to RCA's requests, thus increasing the loan balance to approximately $6,300,000.

The aforementioned note executed May 12, 1975, in conjunction with the construction loan agreement (see text, page 1177) provides in pertinent part as follows:

[RCA promises to pay CPI] the principal sum of TEN MILLION DOLLARS ($10,000,000.00), or so much thereof as shall then be outstanding, plus interest heretobefore accrued on $6,367,482.87 thereof to the date hereof amounting to $520,265.19, with interest on said $6,367,482.87 and said accrued interest from the date of each advance thereof * * *

CPI recorded the $520,265.19 representing interest as an increase to the outstanding loan balance (now about $6,800,000), but there was no wire transfer of money back and forth between CPI and RCA at that time.

The earlier-mentioned revision to the May 12, 1975, note changed the computation and payment terms of the interest owed to CPI. In pertinent part, it stated that interest between May 12, 1975, and the earlier of either the completion of the shopping center or March 31, 1979, would be payable on the last day of each March, June, September, and December. If no moneys were available to pay the interest at those times (i.e., the loan limit was used up for other construction expenses) that interest would be due March 31, 1979.

Thereafter, CPI made additional advances to RCA for the project. As of December 1, 1975, RCA had borrowed approximately $8,900,000.

On December 18, 1975, another substantially simultaneous wire-funds transfer of $520,265.19 occurred involving CPI and RCA. This transfer was carried out in the same manner as the previous two, with the exact same amount that was sent to RCA being returned to CPI later that day. However, the effect of these transfers was a "wash" on the obligations between the parties. The principal balance of the loan was neither increased nor decreased. This is because the amount transferred represented the same interest accrued for the period September 1, 1974, through May 11, 1975, which had already been

added to the outstanding loan balance on the books of CPI. No written agreement existed for the retransfer of the funds to CPI. The transaction was performed in accordance with a verbal agreement among the parties.

On December 18, 1975, prior to the receipt of the wire transfer from CPI, RCA's account balance at Baltimore Bank & Trust Co. was in the neighborhood of $85,000, which did not reflect about $64,000 worth of previously drawn but uncleared checks.

For its 1975 taxable year, RCA reported a net loss of $860,645. Such loss was partially the result of a $690,522 interest deduction of which $520,265.19 represented the amount wired to CPI and which respondent contests.[10] Petitioner Norman Menz's share of RCA's loss for 1975 was $172,215. This resulted in petitioners' reporting a net operating loss of $140,515 for that year. That loss was carried forward to and applied against petitioners' 1976 taxable income.[11]

A similar wire exchange of funds occurred in 1976.

On December 13, 1977, RCA borrowed $1 million from Boatmen's Bank & Trust Co. (formerly Baltimore Bank & Trust Co.), and the proceeds were deposited in its account at that bank two days later.

On December 15, 1977, RCA sent two checks payable to CPI in the amounts of $461,378 and $520,265.19. These checks were designated in RCA's records as "Interest for 1974" and "Interest for 1975," respectively. These amounts reduced the then-existing loan balance with CPI. RCA claimed the December 15, 1977, payments as part of its interest expense deduction on its 1977 Form 1065. RCA reported a net loss in excess of $2,400,000 for that year. Petitioners deducted petitioner Norman Menz's allocable share of that loss in computing their 1977 taxable income.

---

[10]Respondent apparently concedes the balance of the interest deduction claimed by RCA in 1975.

[11]Respondent did not determine a deficiency for 1975 because petitioners experienced a net operating loss in that year from losses incurred in other transactions.

## Control of the Funds

PPI Dover Corp. (hereinafter PPI Dover) the 1 percent general partner of RCA, was a wholly owned and controlled subsidiary and nominee of CPI during the years in question. The main function and overriding reason for PPI Dover's presence in RCA was to protect CPI's interests in its dealings with the partnership. Blitt and Copaken were designated as the Managing General Partners of RCA. Under the partnership agreement:

Any decision or action by the General Partners shall require the approval of PPI [Dover] and either Blitt or Copaken, and any decision or action so approved shall be binding upon all the General Partners and the Partnership unless this agreement expressly provides otherwise as to certain specific acts or decisions. Provided, however, the decision as to whether to prepay the indebtedness owed to CPI shall be made by Blitt and Copaken subject to the approval of PPI which PPI agrees not to unreasonably withhold or delay * * * . Third parties dealing with the Partnership may rely conclusively upon the power and authority of the General Partners as herein set forth.

Contravention of the partnership agreement could result in either binding arbitration, injunctive relief, or dissolution of the partnership.[12]

Another provision of the partnership agreement reads:

5.6 *Bank Accounts.* Funds of the Partnership shall be deposited in an account or accounts of a type and in a bank or banks selected by the General Partners. *Withdrawals from such bank accounts shall be made by the General Partners or persons authorized by the General Partners to make withdrawals.* [Emphasis supplied.]

---

[12]The partnership further provides:

"8.9. *Equitable Remedies.* (a) the rights and remedies of any of the Partners hereunder shall not be mutually exclusive, i.e., the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provision hereof. Each of the Partners confirms that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and that in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to limit or affect, nor shall it limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, the respective rights and obligations of the Partners hereunder being enforceable in equity as well as at law or otherwise."

Regarding dissolution: Under New Jersey law, which is the law applicable to RCA, a limited partnership can be dissolved for the willful or persistent breach of the partnership agreement or the misconduct of a general partner. See *Cusano v. Cusano*, 19 N.J. Super. 255, 88 A.2d 342 (1952); N.J. Rev. Stat. secs. 42:1–32, 42:2–13 (1953).

A section of the finance agreement executed between CPI and RCA in September 1973 reads as follows:

3.23 *Consent and Approval by CPI.* All agreements negotiated or entered into and all actions and undertakings of Associates taken pursuant to Sections 3.01 and 3.02 [regarding the budgeting of items, including interest] shall be taken only after the approval thereof by CPI.

As to the relationship between CPI and RCA, PPI Dover's[13] principal function in RCA was the holding of an "approval power" over the partnership's major transactions. These would include sales of property, additional construction, major financing agreements or alterations, and things of such nature. However, PPI Dover was not involved in the day-to-day transactions of RCA, nor did it normally control the disbursements from the bank accounts of RCA. PPI Dover would not have been involved in the mechanics of the wire exchanges between RCA and CPI. Once CPI wired funds to the credit of the RCA account it did not possess power over the disbursement of those funds in excess of that provided through the general provisions of the loan and the RCA limited partnership agreement.

While the RCA partnership agreement specifically stated that PPI Dover, as a general partner, would be empowered to make withdrawals from RCA's bank accounts, only Irwin Blitt and Paul Copaken were signatories for the partnership.

## OPINION

In the case of cash basis taxpayers, section 163(a)[14] generally permits a deduction only for interest "paid" within the taxable year.[15] The payment required to secure the interest deduction is the payment of cash or its equivalent. The delivery of the taxpayer's promissory note in satisfaction of an interest obligation is not the equivalent of cash, but is merely a

---

[13]Because PPI Dover was wholly owned by CPI and acted as CPI's nominee, control by PPI Dover was essentially the same as by CPI itself.

[14]SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

[15]Subsequent to the years in question, Congress enacted sec. 189, which has effectively eliminated the total deduction in the year paid of real property construction-period interest and taxes in situations such as the present case. Compare sec. 189(d).

promise to pay. *Helvering v. Price*, 309 U.S. 409 (1940); *Nat Harrison Associates v. Commissioner*, 42 T.C. 601 (1964); *England v. Commissioner*, 34 T.C. 617 (1960). A similar result is reached where a creditor withholds a certain sum from the face amount of a loan as interest, making available to the borrower only the loan proceeds (a discounted loan). Because that situation is practically indistinguishable from the one where a taxpayer delivers his note, it has consistently been held that the amount of interest withheld by the lender does not constitute payment. *Rubnitz v. Commissioner*, 67 T.C. 621, 628 (1977); *Cleaver v. Commissioner*, 6 T.C. 452, 454 (1946), affd. 158 F.2d 342 (7th Cir. 1946).

A deduction *is* secured, however, in situations where a taxpayer discharges interest payable to one lender with funds obtained from a second lender. *McAdams v. Commissioner*, 15 T.C. 231 (1950), affd. 198 F.2d 54 (5th Cir. 1952). See *Crown v. Commissioner*, 77 T.C. 582 (1981). The interest on the first loan is considered paid when the funds are transferred to the first lender, not in the later year upon the discharge of the second indebtedness. *Crown v. Commissioner*, 77 T.C. at 593–595; *Perry v. Commissioner*, 28 B.T.A. 497 (1933). See *Heyman v. Commissioner*, 70 T.C. 482, 485 (1978), affd. without published opinion 633 F.2d 215 (6th Cir. 1980), and affd. 652 F.2d 598 (6th Cir. 1980).

Within these parameters, confusion has arisen with respect to the proper tax treatment of interest paid to a lender with funds advanced from that same lender. The confusion results because of a disparity of result among cases of similar economic impact. See *Noble v. Commissioner*, 79 T.C. 751, 767 (1982).

On the other hand, some factual situations produce agreement as to the result. In particular, interest debited to a loan account (that is, increasing the loan by the required interest payment) is not deductible in the year of the debit. *Heyman v. Commissioner*, 70 T.C. at 485, 487; *Rubnitz v.Commissioner*, 67 T.C. at 627, 628. The supporting theory is that such a transaction is considered as more akin to the delivery of a note or discounting than borrowing from a second lender. See *Franklin v. Commissioner*, 77 T.C. 173, 183 (1981), revd. on a different issue 683 F.2d 125 (5th Cir. 1982). The deduction is also denied where a taxpayer maintains a bank account at the

bank where the loan was obtained, the bank credits the account with the loan proceeds and then immediately charges the account for the interest due (or similarly, the payor simply delivers a check drawn on that account). *Watson v. Commissioner*, 8 T.C. 569, 578–579 (1947); *Ferris v. Commissioner*, 38 B.T.A. 312, 316–317 (1938), affd. per curiam 102 F.2d 985 (2d Cir. 1939). See *Rubnitz v. Commissioner*, *supra*; *Blitzer v. United States*, 231 Ct. Cl. ___, 684 F.2d 874 (1982).

In analyzing these cases, it appears that deductibility turns on whether the taxpayer exercises "unrestricted control" over the money borrowed from the same lender. *Noble v. Commissioner*, 79 T.C. at 767; *Franklin v. Commissioner*, 77 T.C. at 183; *Wilkerson v. Commissioner*, 70 T.C. 240 (1978), revd. 655 F.2d 980 (9th Cir. 1981); *Rubnitz v. Commissioner*, 67 T.C. at 629. This test arises from the progeny of the so-called *Burgess* rule: Where a lender gives up control of borrowed funds, the funds are commingled with the taxpayer's other funds in an account at an institution separate from the lender, and the interest obligation is satisfied with funds from that separate account, there has been a payment of interest under section 163(a). *Burgess v. Commissioner*, 8 T.C. 47 (1947); as subsequently refined by[16] *Wilkerson v. Commissioner*, 70 T.C. at 258–260; *Burck v. Commissioner*, 63 T.C. 556, 559–560 (1975), affd. on other grounds 533 F.2d 768 (2d Cir. 1976). See *Franklin v. Commissioner*, 77 T.C. at 184.

Despite its now 36-year longevity, the *Burgess* rule has met with some recent criticism. In *Battelstein v. Internal Revenue Service*, 631 F.2d 1182 (5th Cir. 1980) (en banc), cert. denied 451 U.S. 938 (1981), the Court of Appeals for the Fifth Circuit, in a case similar to the instant one, announced a prerequisite to the application of the "unrestricted control" test. The court

---

[16]In *Burgess v. Commissioner*, 8 T.C. 47 (1947), we also noted that the purpose of the second loan was not solely to pay interest due on the first. This fact (or rather, contesting it) was of prime consideration to the dissent in that case. The subsequent cases refining *Burgess* moved from a position of equal consideration of the four factors set out in *Burgess* to one of focusing mostly on control (and later, unrestricted control). However, it was never the rule that the borrower's purpose in acquiring the additional funds was to be disregarded. See, e.g., *Noble v. Commissioner*, 79 T.C. at 769; *Franklin v. Commissioner*, 77 T.C. 183, 187, revd. on other grounds 683 F.2d 125 (5th Cir. 1982).

The majority in *Burgess* distinguished *Cleaver v. Commissioner*, 6 T.C. 452 (1946), affd. 158 F.2d 342 (7th Cir. 1946) (a discounted-loan case) as follows: "Obviously, the interest in the *Cleaver* case never went through the hands of the borrower and never passed through his bank account." 8 T.C. at 50.

determined that unrestricted control, standing alone, was insufficient. Disregarding the form of the transaction, the court concluded that if funds had been borrowed from the same lender for the primary purpose of financing interest on a prior loan, interest has not been "paid" within the meaning of section 163(a), it has merely been postponed. 631 F.2d at 1184. See *Noble v. Commissioner*, 79 T.C. at 767 n. 14. In *Wilkerson v. Commissioner*, 655 F.2d 980 (9th Cir. 1981), revg. 70 T.C. 240 (1978), the Ninth Circuit adopted this "purpose" test of the Fifth Circuit,[17] and in support thereof, it noted that the taxpayer had earmarked a portion of the proceeds of the second loan for the payment of the interest due and owing, and had not shown that other funds were available with which payment could be made.[18]

In the instant case, respondent argues that RCA never had "unrestricted control" over the loan proceeds from CPI by virtue of PPI Dover's approval power over the decisions of RCA and because of the provisions in the loan agreements themselves. He also asserts that under *Battelstein* and the Ninth Circuit decision in *Wilkerson*, no deductions are allowed. This is because he claims the funds advanced were part of virtually simultaneous transfers that were actually prearranged integrated steps in a single transaction that had as its sole purpose the creation of substantial yearend tax deductions for RCA. He contends that, in substance, these transactions are no different than a mere rolling in of the accrued interest into the outstanding loan balance, and therefore should be deductible only at a future date. Compare *Cleaver v. Commissioner, supra.*

Petitioners claim that RCA's managing partners (Blitt and Copaken) were the only ones who controlled the disbursement of money from the partnership checking account, that PPI Dover Corp. never engaged in the day-to-day operation of the

---

[17]However, see *Franklin v. Commissioner, supra,* wherein the Fifth Circuit did not consider the taxpayer's purpose in obtaining subsequent loans (the proceeds of which were acquired solely for the payment of interest on prior loans from the same lender). In that case a deduction was allowed.

[18]Some earlier opinions also criticized our control test. See *Burck v. Commissioner,* 533 F.2d 768, 770 n. 3 (2d Cir. 1976), affg. on other grounds 63 T.C. 556 (1975), separate opinion of Judge Oakes (dictum); *Goodstein v. Commissioner,* 267 F.2d 127 (1st Cir. 1959).

business, and therefore RCA had "unrestricted control" of the funds advanced from CPI. Hence they contend that the *Burgess* rule has been satisfied and that we should not accept the "purpose" test as applied in the Circuit Courts' opinions in *Battelstein* and *Wilkerson*.

We hold for respondent on the ground that RCA did not meet the requirements of the *Burgess* rule because it did not exercise unrestricted control over the funds advanced from CPI.[19]

First, petitioners assert that RCA's purpose for entering into the simultaneous wire-funds transfers was not solely to secure interest deductions. They argue that the overall arrangement between RCA and CPI was for the purpose of financing the development and construction of a regional shopping center; that this was a complex undertaking requiring funds for many purposes, of which interest payments were simply one. They conclude that once a valid business reason for the transaction exists, the purpose test has been met and the issue of control then becomes dispositive, citing *Noble v. Commissioner, supra.* Moreover, they stress here, as well as in later arguments, that characterization of this arrangement as a device for securing an interest deduction totally ignores the reality of the construction industry and requires needless segregation of the relationship between RCA and CPI into isolated transactions (i.e., having to secure a second lender merely to fund the interest payments to CPI and then using CPI funds to pay interest to the second lender).

We disagree with petitioners' arguments regarding the purpose for entering into the wire-funds transfers. We find nothing in the *Noble* opinion which suggests that in determining the purpose for entering into the questioned transactions, *which here are the wire-funds transfers*, we should look solely to the purpose for establishing the *entire* financing agreement between RCA and CPI. That the entire $10 million was loaned to RCA for valid business purposes does not mean that the interim loan requests necessarily share that same purpose. We conclude that the purpose for the wire-funds exchanges was solely for the payment of interest to CPI because (1) the

---

[19] We therefore leave to another day the question of whether to follow the Fifth and Ninth Circuits' lead as to which factor or test is paramount.

amounts transferred to Baltimore Bank & Trust Co. were exactly the same which were retransferred to CPI in 1974 and 1975, and (2) the letter of Mr. Fingersh expressly stated that these moneys represented periodic interest.

While we acknowledge petitioners' second argument that all RCA did was follow modern day real estate financing techniques, we think that is a matter best left to Congress. See note 15 *supra.*

We now turn to the other test: whether RCA had unrestricted control of the funds received from CPI. This is a question of fact to be determined from an examination of all the surrounding facts and circumstances.

We conclude that RCA did not have unrestricted control over the loan proceeds for the following reasons: (1) The loan to RCA from CPI, the deposit into RCA's account, and the retransfer of the funds to CPI were all simultaneous; (2) RCA's other funds in its account with which it could pay interest were de minimis; (3) the loans made in December of 1974 and 1975 were made solely for the purpose of paying interest (and in fact required the prior approval of CPI before they could be "paid"); (4) the funds borrowed in the wire transfers are easily traceable through the RCA account to the asserted interest payments; (5) and, probably most significant, PPI Dover was present as an RCA general partner, possessing an approval power over all of that partnership's major transactions while it was wholly owned and completely controlled by the lender, CPI. *Noble v. Commissioner*, 79 T.C. at 769; *Franklin v. Commissioner*, 77 T.C. at 187.

Petitioners strongly urge that the case law, particularly our opinion in *Wilkerson*, supports their contention. They claim that because (1) PPI Dover never involved itself in the mechanics of the wire transfers, (2) was not a managing partner, and (3) was not a signatory on the RCA bank account, RCA's control of the funds was unrestricted. We do not agree.

The term "unrestricted" control first arose in *Rubnitz v. Commissioner, supra,* a discounted-loan case. There the taxpayer urged us to allow an interest deduction on the grounds that his transaction was not different than where a creditor bank deposits money into a borrower's account and then causes the money to be retransferred to pay interest on a prior loan. We rejected this claim, stating:

However, even if the loan transaction had been so structured—and it was not—[the borrower] would not necessarily be treated as having "paid" the loan fee. *For the critical point which appears from the record before us is that [the borrower] never had unrestricted control over any portion of the loan proceeds * * ** . Its powers in respect of these funds were at all times subject to substantial limitations. Under such conditions, a prearranged retransfer of funds immediately after they had been deposited in [the borrower's] account, as the final step in an integrated transaction, would not constitute the "payment" which gives rise to a deduction by a cash basis taxpayer * * *. Moreover, there is no evidence that [the borrower] had sufficient assets— apart from the loan proceeds—from which it could have paid the loan in full. [67 T.C. at 629. Emphasis supplied.]

While at first blush it may appear that this language from *Rubnitz* should be dispositive of the present case, that passage has been distinguished. In the hypothetical in *Rubnitz*, the bank account of the borrower where the funds were deposited was maintained with the *lender*. "Therefore, even though the loan proceeds were first credited to the accounts, the lenders retained control over the proceeds by virtue of the accounts being maintained with the lenders." *Wilkerson v. Commissioner*, 70 T.C. at 258. In the present case, the accounts of RCA and CPI were at separate institutions. While petitioners may be correct that *Rubnitz* is not in line on that fact, their reliance on *Wilkerson* generally is misplaced. Although the bank accounts may have been separate, at all times the funds received from CPI were subject to substantial limitations and there were no other funds available with which to pay the interest owing on the loan.

In *Wilkerson*, a real estate construction partnership utilizing the cash method of accounting borrowed funds from the original lender for the purpose of making the first payment under a preexisting loan. No other funds were available in the borrower's checking account with which payment could be made. If the borrower had not paid the amount required under the agreement, it would have been in default under the terms of the loan and the lender would not have continued to advance funds under the construction contract. However, we chose not to address what impact a default would have had, and found as fact that the borrower had been given "unrestricted physical control over the loan advance at the time it was deposited in the [borrower's] account." 70 T.C. at 244. On that basis, we held that the taxpayer's situation in *Wilkerson*

was not meaningfully distinguishable from the *Burgess* and *Burck* cases and found that there had been the requisite "payment" of interest.

Here the facts are significantly different from those in *Wilkerson.* The entire reason for PPI Dover's presence as a general partner with approval power over RCA's transactions was to ensure that the funds disbursed by CPI would in fact be applied to those expenses for which they were requested from CPI and were approved by CPI. Blitt or Copaken were powerless *under the RCA partnership agreement* or the financing agreements to direct the wire-funds proceeds to anything other than what was agreed upon. If they in fact did attempt to do so, PPI Dover (at CPI's direction) might dissolve the RCA partnership, obtain injunctive relief, or at a minimum send it to binding arbitration. RCA was specifically prohibited by its agreements with CPI from borrowing funds from a third party without PPI Dover's approval. If Blitt and Copaken attempted to contravene the partnership provisions, PPI Dover could simply withhold approval or possibly terminate the partnership. In short, we think that the power that PPI Dover possessed over RCA was too fundamental and significant to conclude that RCA's control of the funds was unrestricted.

Accordingly, we reject petitioners' argument that Blitt and Copaken's presence as the managing partners of RCA, combined with the fact that all disbursements from the account were controlled by their office, is sufficient to establish that they had "complete control" of the funds. It is unpersuasive. While those factors are indicia of control, we think the five factors we have previously enumerated show that Blitt and Copaken had no control over the funds which can be classified as complete or unrestricted. Accordingly, the retransfers to CPI of the amounts wired to RCA on December 27, 1974, and December 18, 1975, do not qualify as payments of interest under section 163(a).

To reflect our holding with respect to the disputed issue,

*Decision will be entered for the respondent.*