**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1569-16T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

HAKEEM T. MERCER,

     Defendant-Appellant.

_____

Submitted September 13, 2018 – Decided January 30, 2019

Before Judges Whipple and DeAlmeida.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 13-11-1394.

Joseph E. Krakora, Public Defender, attorney for appellant (Anderson D. Harkov, Designated Counsel, on the brief).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Hakeem T. Mercer appeals from the February 10, 2016 and April 26, 2016 orders of the Law Division denying motions to suppress evidence, and the sentence imposed after entry of his guilty plea to conspiracy to commit aggravated assault. We affirm.

I.

The following facts are derived from the record. On April 5, 2013, defendant was seen by several witnesses arguing with a group of men in a bodega in Carteret. Defendant called his brother, Yasin Bell, to assist him in a planned assault of the group. Bell arrived with co-defendant Daniel J. Gillens, who, unbeknownst to defendant, brought a handgun. The three men engaged in a physical confrontation with the group.

A police officer, on alert from an anonymous tip that a shooting was about to take place, heard gunshots from the area of the bodega. In less than a minute, he arrived at the scene to find twenty-six-year-old Deont'e J. Shakleford on the ground fatally wounded by multiple gunshots. Shakleford had not been part of the group with whom defendant had argued. He exited a vehicle and approached the bodega when he saw that his father was involved in the confrontation. Several of his family members were present when he was shot.

A-1569-16T2

Witnesses described the shooter as a heavyset, African-American man wearing a red and white sweatshirt with burgundy or maroon sweatpants. The witnesses described the direction in which the shooter ran from the scene. An officer in the area to which the suspect fled, having been informed of the shooter's description, encountered a person, later identified as Gillens, who matched the description. The officer asked Gillens if he could speak with him. Gillens's response was to flee on foot. The officer pursued him. During the chase, another officer saw Gillens discard a handgun in a grassy area as he rounded a corner outside the view of the pursuing officer. After Gillens was apprehended, officers recovered the gun.

The next day, Gillens was interviewed by detectives. After the interview, the State authorized charges against defendant, who was then arrested.

On November 7, 2013, a State grand jury indicted defendant and Gillens for first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-2; first-degree murder, N.J.S.A. 2C:11-3(a)(1)-(2); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b). The grand jury also indicted defendant for second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b).

3

Gillens moved to suppress the gun, arguing that he was seized by the officer's pursuit, which was initiated without reasonable suspicion of criminal conduct, and that the gun, discarded as a result of the illegal seizure, cannot be deemed to have been abandoned by him. Defendant joined the motion.

The trial court held a suppression hearing at which two officers testified. On February 10, 2016, the court entered an order denying the motion. In a comprehensive written opinion, the court concluded that Gillens was seized when the officer pursued him. The court concluded, however, that the seizure was lawful because the officer "had a particularized suspicion that . . . Gillens was involved in criminal activity based on the fact that he matched a very specific description provided by multiple witnesses and police personnel" of the shooter who fled toward the area where he encountered Gillens. This suspicion and Gillens's flight were sufficient to permit the officer's pursuit.

The court also concluded that Gillens voluntarily discarded the gun during the pursuit. As the court explained,

> any privacy interest . . . Gillens maintained in the gun as personal property was relinquished when [he] knowingly and voluntarily surrendered control over the gun by hastily throwing it into a grassy area between apartment buildings. [T]here is a strong implication that . . . Gillens abandoned the gun specifically in response to the encounter with [police]; that he made the decision to throw the gun after he rounded the

4

corner in order to discard the weapon out of [the officer's] sight; and, that he threw the gun in order to avoid being apprehended with the weapon on his person.

Gillens later moved to suppress transcripts of eleven telephone conversations he had with his former girlfriend while he was incarcerated at the Middlesex County Adult Correction Center (MCCC) awaiting trial. The State intended to use the transcripts as evidence that Gillens and defendant engaged in a conspiracy to commit murder, and that the killing of Shakleford was gang related. Gillens claimed use of the transcripts would violate his right to privacy under the Fourth Amendment, and its State equivalent, as well as his right to counsel under the Sixth Amendment, and its State equivalent. The parties dispute whether defendant joined this motion.

On April 26, 2016, the trial court entered an order denying Gillens's motion. In a detailed written opinion, the court found that Gillens received notice when he was admitted to the MCCC that his calls, except for legal calls, would be recorded and monitored for security purposes. A similar notice appeared on the form on which inmates request phone privileges at the MCCC. In addition, at the start of each call, a recorded message reminded Gillens that the call may be monitored and recorded. The court noted that it has long been established that prison officials may monitor and record inmate telephone calls

5

for the safety and security of the facility. Thus, the court concluded Gillens did not have an expectation of privacy in his jailhouse calls.

In addition, the court rejected Gillens's right to counsel arguments, concluding that the conversations were not with his attorney and did not concern trial strategy, and the recordings did not interfere with his ability to prepare his defense. Finally, the court rejected as meritless Gillens's contention that recording the calls was the equivalent of employing a jailhouse informant to solicit incriminating evidence. The trial court noted that Gillens initiated the calls at issue, his former girlfriend was not an agent of law enforcement, and the recordings were conducted openly with notice.

On May 11, 2016, defendant entered a guilty plea to an amended count indictment charging him with second-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:12-1(b)(1). In exchange, the State agreed to drop all remaining charges and recommend a ten-year sentence subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[1]

The court accepted defendant's guilty plea following a plea colloquy:

---

[1] Gillens entered a guilty plea to aggravated manslaughter, N.J.S.A. 2C:11-4. He admitted that he went to Carteret to assist defendant with a physical altercation, and that he shot Shakleford. The court sentenced him to twenty-five years of incarceration, with an eighty-five-percent period of parole ineligibility.

6

Q: Okay. On April 5, 2013, you were in Carteret; correct?

A: Yes.

. . . .

Q: And earlier in the day in Carteret, you were alone at a store . . . a little corner store or a bodega; is that correct?

A: Yes.

Q: And there was a time where you were approached by a group of individuals . . . and you got into a verbal altercation with those individuals; correct?

A: Yes.

Q: And after you got into the verbal altercation with the individuals, you then . . . you made a call to your brother . . . Yasin Bell; correct?

A: Yes.

Q: And in calling Yasin Bell, you were requesting of him that he come to where you were, so he could assist you with a fight that was going to happen; correct?

A: Yes.

Q: And when Yasin Bell arrived, Mr. Gillens, Daniel Gillens, who sits beside you, he was with Yasin Bell, correct?

A: Yes.

A-1569-16T2

Q:     And after that, you individuals, in fact, went back to the area of the store [and] it was your intention and the intention of the group to get into a physical altercation; correct?

A:     Yes.

Q:     And you're conceding that, in going to get into that physical altercation, it was your intent to cause serious bodily injury to the individuals on the other end of that altercation; correct?

A:     Yes.

During the plea allocution, defendant did not admit to directing the murder of any individual, nor did he admit to being a gang member.

On October 14, 2016, the trial court held a sentencing hearing, during which the State submitted a sentencing memorandum outlining the evidence in its file regarding the events leading up to Shakleford's death. The memorandum included a summary, derived from witness statements, of the verbal altercation that resulted in defendant's call to his brother. According to the State, defendant, who lived in Newark, had been selling drugs in Carteret while he was staying with his sister, and the argument concerned drug dealing near the store. The State asserted that during the dispute defendant identified himself as a member of the Bloods, a street gang, and made threatening remarks, including a promise that "someone was going to die" that night.

8

The State also tied defendant and Gillens to gang activity in other ways:

> Defendant Mercer bragged to Detectives during this investigation about his "rap videos." As your Honor is aware, the State provided these videos as part of discovery in this case. Not only are the videos replete with reference to drug dealing and murder but in some videos gang symbols are displayed. And, shockingly one particular video, "1000 grams," reenacts a murder where the victim is approached from behind and shot in the head. The lyrics by Mercer: "I could get you murdered for a thousand grams."

> The evidence similarly supported Defendant Gillens'[s] gang affiliation. Defendant Gillens'[s] cell phone had several references to the Blood's (sic) street gang. Additionally, [Gillens] has tattoos consistent with gang affiliation. Specifically, [Gillens] has two tear drops tattooed on his face. During pre-trial litigation, it was argued by Defendant Gillens, that the nature and meaning of the tattoos were so well-known that he should be permitted to cover them during the trial to avoid undue prejudice.

Finally, the State suggested defendant ordered a hit on one of the people with whom he had been arguing and that Gillens mistook Shakleford for that person.

During the hearing, the assistant prosecutor made the following remarks, urging the court to rely on the pretrial witness testimony:

> On April 5, 2013, the [c]ourt knows that there was a[n] altercation at the store involving Hakeem Mercer. We had a pretrial motion on this issue where [Ms.] Alston testified as to what she heard on that day. [She] was only one of the several [S]tate's witnesses that overheard Hakeem Mercer during that altercation.

9

From what th[e] [S]tate can tell, Judge, the altercation was over drug dealing. That Mr. Mercer wanted to sell drugs in Carteret and that the local individuals, who may or may not have been dealing in that area, were opposed to it. I'm not asking the [c]ourt, obviously, to consider any evidence of drug dealing and hold it against Mr. Mercer, but just to provide some background as to why we're here.

. . . .

[T]he victim's [cousin], Jahir Foster, [fifteen] years of age . . . overhear[d] Mr. Mercer say "I'll kill you with my bare hands. I'll shoot your face off. I'm going to show you how we get down in Newark."

On the phone [before the shooting], [defendant] said "It's about [twenty] Bloods outside the store and they're trying to get at me, so I need you all to come out here and get out here now."

Saying to [to one individual], "Y'all fake Blood, but we Blood, true Blood from Newark and I'm going to show you how we get down, cause we don't play."

"Yeah, you a fake Blood. You got that fake body on you. I'm going to show you how we get down in Newark. We true Bloods. We don't play and I promise you we gonna get you all. One of you all is going to die."

Alston's statements and the rap videos were the subject of pretrial motions. The trial court concluded that Alston's statements were admissible, but did not reach a decision on the videos before entry of defendant's guilty plea.

10

At the sentencing hearing, defendant's counsel disputed the State's account of what took place before the shooting and denied defendant was in a gang. Although the plea agreement incorporated the State's recommendation of a ten-year sentence, defendant's counsel urged the court to impose a five-year term.

The court found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), defendant's risk of recidivism, was applicable because defendant was on probation as a result of two counts of distribution of a controlled dangerous substance was this crime occurred. The judge also noted that defendant had been disciplined while at the MCCC for refusing an order and threatening another inmate. The court additionally found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), criminal deterrence, applicable.

With respect to both aggravating factors the court found that

> [t]here was a verbal confrontation that did take place. Mr. Mercer argues that he was unaware there would be any weapons involved. There is testimony to the extent that Mr. Mercer made comments about the individuals there being fake Bloods, that someone was going to die today. And according to [one witness], Mr. Mercer told him that he should [not] be in the area, because he was going to murder one of them.
>
> Now, Mr. Mercer denies these allegations through counsel. And the [c]ourt had an opportunity to address the credibility of Ms. Alston at a hearing and I did find her credible . . . .

11

> So, to the extent that there were comments made by Mr. Mercer, that there were comments made to the other individuals that were in the area, and that there was a call made, I find that compelling when it applies to [aggravating] factors three and nine.

The court declined to find aggravating factors one, especially heinous, cruel, or depraved acts, N.J.S.A. 2C:44-1(a)(1), two, the victim was vulnerable or incapable of resistance, N.J.S.A. 2C:44-1(a)(2), five, substantial likelihood defendant was involved in organized criminal activity, N.J.S.A. 2C:44-1(a)(5), and six, extent of defendant's criminal record, N.J.S.A. 2C:44-1(a)(6).

As to the mitigating factors, the court considered factor six, N.J.S.A. 2C:44-1(b)(6), victim compensation based on defendant's willingness to compensate the victim's family, giving the factor little weight. The court rejected the mitigating factors urged by defendant's counsel: three, defendant acted under strong provocation, N.J.S.A. 2C:44-1(b)(3); four, there were substantial grounds justifying or excusing his conduct, N.J.S.A. 2C:44-1(b)(4); and five, the victim's conduct induced or facilitated the crime, N.J.S.A. 2C:44-1(b)(5).

After weighing the aggravating and mitigating factors, the court sentenced defendant to a ten-year period of incarceration, with an eighty-five-percent period of parole ineligibility, pursuant to NERA, the terms recommended by the

12

State pursuant to the plea agreement. The court also assessed fines and penalties and ordered defendant to serve three years on parole after his release.

This appeal followed. Defendant makes the following arguments:

POINT I

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED AS A RESULT OF A WARRANTLESS SEARCH BECAUSE THE SEIZURE OF THE RECORDINGS OF DEFENDANT GILLENS'[S] PHONE CALLS FROM THE JAIL WAS MADE WITHOUT INFORMED CONSENT, CONTRARY TO THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.

POINT II

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS THE FIREARM SEIZED NEAR THE SCENE OF GILLENS'[S] ARREST AS A RESULT OF A WARRANTLESS SEARCH, CONTRARY TO THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.

POINT III

THE RELIANCE BY THE SENTENCING COURT, WITHOUT DEFENDANT'S CONSENT, ON FACTS THAT WERE NOT PART OF DEFENDANT'S FACTUAL BASIS AND WERE ALSO REPEATEDLY CONTESTED BY DEFENDANT AND HIS ATTORNEY, VIOLATED DEFENDANT'S RIGHT TO TRIAL BY JURY AND STATE V.

13

NATALE, AND REQUIRES A REMAND FOR A NEW SENTENCE HEARING.

POINT IV

DEFENDANT'S SENTENCE WAS EXCESSIVE AND CONSTITUTED AN ABUSE OF DISCRETION, REQUIRING HIS SENTENCE BE VACATED AND THE CASE RETURNED TO THE TRIAL COURT FOR A NEW SENTENCE HEARING.

II.

A.     Seizure of Gillens's Handgun.

As a preliminary matter, the State argues defendant lacks standing to challenge the seizure of Gillens's handgun. "Under our well-established State constitutional jurisprudence, an accused generally has standing to challenge a search or seizure whenever 'he has a proprietary, possessory or participatory interest in either the place searched or the property seized.'" State v. Randolph, 228 N.J. 566, 571-72 (2017) (quoting State v. Alston, 88 N.J. 211, 228 (1981)). "When the accused is charged with committing a possessory . . . offense . . . standing is automatic, unless the State can show that the property was abandoned . . . ." Randolph, 228 N.J. at 571-72 (citing State v. Brown, 216 N.J. 508, 529 (2014)). The abandoned property doctrine is a "narrow exception" to the automatic standing rule. State v. Johnson, 193 N.J. 528, 549 (2008).

14

> [F]or standing purposes, property is abandoned if: (1) a person has either actual or constructive control or dominion over property; (2) he knowingly and voluntarily relinquishes any possessory or ownership interest in the property; and (3) there are no other apparent or known owners of the property.
>
> [State v. Carvajal, 202 N.J. 214, 225 (2010) (citing Johnson, 193 N.J. at 549).]

"The test is whether, given the totality of the circumstances, an objectively reasonable police officer would believe the property is abandoned." Brown, 216 N.J. at 531.

Here, defendant was charged with two counts in which possession of the handgun was an element, circumstances that ordinarily would vest him with automatic standing to appeal the trial court's suppression order. The State, however, argues that because the trial court found that Gillens abandoned the gun during a constitutionally sound pursuit, defendant falls within a "narrow exception" to the automatic standing rule. We agree.

After weighing the credibility of the witnesses who testified at the suppression hearing, the trial court concluded that Gillens voluntarily abandoned the gun while fleeing from a lawful pursuit.

> We are bound to uphold a trial court's factual findings in a motion to suppress provided those findings are supported by sufficient credible evidence in the record. Deference to those findings is particularly appropriate

15

> when the trial court has the opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.
>
> [State v. Watts, 223 N.J. 503, 516 (2015) (citations and quotations omitted).]

There is ample support in the record for the trial court's finding that Gillens abandoned the gun in response to his encounter with a police officer. Gillens tossed the gun in a grassy area of an apartment complex as he fled. His purpose, as made plain by the evidence admitted at the hearing, was to not be in possession of the gun when police officers caught up to him. See State v. Ramos, 282 N.J. Super. 19 (App. Div. 1995) (holding that a package discarded when defendant fled from an attempted investigatory stop based on reasonable suspicion is admissible).

Nor are we persuaded by defendant's argument that the pursuit of Gillens was undertaken unlawfully, thus vitiating his abandonment of the gun. We review the trial court's determination that the officers had particularized suspicion of criminal activity when they pursued Gillens, a question of law, de novo. State v. Vargas, 213 N.J. 301, 327 (2013). Under both Article I, Paragraph 7 of our State Constitution and the Fourth Amendment, a person is free from unreasonable searches and seizures. U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. A warrantless seizure is presumptively invalid. State v. Mann,

203 N.J. 328, 337 (2010).  To be lawful, a warrantless seizure must fall within one of the few well-delineated exceptions to the warrant requirement.  Id. at 337-38.  One such exception is an investigatory stop.  Id. at 338.

An investigatory stop "is valid if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity."  Ibid. (quotation omitted).  A court reviewing this issue must assess whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate."  Ibid. (citation omitted).  This must amount to something more than an unparticular suspicion or hunch.

The record fully supports the trial court's conclusion that the officer who approached Gillens had reasonable, particularized suspicion that he had participated in a shooting.  Gillens matched the physical description given by witnesses, and was wearing the clothing they described.  He was in the area to which the witnesses saw the shooter flee.  And, when asked by an officer to engage in a conversation, he fled.

Contrary to defendant's argument, the facts of this case are unlike those in State v. Tucker, 136 N.J. 158 (1994).  In that case, Tucker was sitting on a curb when police officers approached him.  In response, he fled.  With no information

regarding Tucker and no reason other than his flight to suspect him of criminal activity, the officers gave chase. The Court held that the pursuit of Tucker, and his ultimate capture, constituted unconstitutional seizures undertaken without reasonable suspicion. Id. at 173. The Court in Tucker emphasized that "evidence of criminality" such as "reports of recent nearby crimes . . . descriptions of recent crime suspects [or] nearby potential or [actual] victims of crimes" could constitute reasonable suspicion. Id. at 169 (second alteration in original) (quoting State v. Tucker, 265 N.J. Super. 358, 360 (App. Div. 1993)). Here, as recounted above, the officer who approached Gillens had ample information suggesting that Gillens had engaged in criminal activity, a crucial distinction from the facts before the Court in Tucker.

B.    Recorded Telephone Calls.

The State argues that defendant did not preserve his right to challenge the April 26, 2016 order because he did not join Gillens's motion to suppress the transcripts of his jailhouse conversations. The trial court's opinion and order on the motion to suppress the transcripts do not mention defendant. This contrasts with the court's opinion and order on the motion to suppress Gillens's gun, which both note that defendant joined the motion. Defendant's counsel, however, presented oral argument on the return date of the motion regarding the recorded

A-1569-16T2

conversations. We consider counsel's participation in oral argument sufficient to preserve the issues raised in the motion for appeal.

We are, however, constrained to conclude that defendant lacks standing to challenge the April 26, 2016 order. Defendant has neither a proprietary, possessory, nor participatory interest in the contents of Gillens's jailhouse telephone conversations. Randolph, 228 N.J. at 571-72. The conversations took place on a publicly owned and operated telephone, in a secure correctional facility, between Gillens and his former girlfriend, after the events underlying the criminal charges against defendant. Defendant is a complete stranger to the conversations. He is not charged with a possessory offense related to transcripts of the conversations. The mere fact that Gillens may have implicated defendant in criminal activity while speaking with his girlfriend is insufficient to vest him with standing to challenge the April 26, 2016 order.

Moreover, the trial court's denial of Gillens's suppression motion was substantively unassailable. Gillens did not have a protected interest in the content of his phone conversations because he was routinely informed that he was speaking on a recorded line and chose to do so. See e.g., State v. Evers, 175 N.J. 355, 370 (2003) (concluding there is no reasonable expectation of privacy attached to a statement made to third parties); State v. Constantino, 254

19

N.J. Super. 259, 262 (Law Div. 1991) (finding no reasonable expectation of privacy attached to a private statement made in a public space). Even assuming, however, that Gillens had a reasonable expectation of privacy in the content of his phone calls, jail officials may impinge upon inmates' privacy rights for legitimate penal interests such as security.

The Law Division addressed this point in State v. Ryan, 145 N.J. Super. 330, 333 (Law. Div. 1976). There, two pretrial detainees in a municipal jail challenged the admissibility of their recorded conversation, which was obtained through the jail's electronic surveillance monitoring system, a one-way intercom to keep officers alert of possible security problems. Id. at 332. The defendants alleged the monitoring violated their Fourth, Fifth, and Sixth Amendment rights and their right of privacy. Ibid. The court disagreed:

> Lawful incarceration necessitates the reasonable withdrawal from a prisoner of certain rights normally enjoyed by a person in free society. It is inherent in our penal system that a prisoner is not clothed with the usual array of guaranteed constitutional rights. It may be true that a prisoner does not leave his constitutional rights at the jailhouse gates, however, a prisoner does not enjoy the same right of privacy as nonincarcerated persons. Lack of privacy must be balanced against reasonable security in the jail. In the end, the scales must be tipped in favor of security.
>
> [Id. at 335.]

That said, however, law enforcement may not disregard the warrant requirement of the Fourth Amendment when conducting a jailhouse search or seizure unrelated to "legitimate penological interests" such as "internal order, discipline, security, and rehabilitation . . . ." Turner v. Safley, 482 U.S. 78, 89 (1987); In re Rules Adoption, 120 N.J. 137, 147 (1990). See also State v. Jackson, 321 N.J. Super. 365, 374-81 (Law. Div. 1999) (holding defendant-inmate's constitutional right to privacy was violated when law enforcement conducted a pre-textual warrantless search of defendant's cell after the prosecutor was denied a search warrant by the judge).

Here, Gillens's conversations were recorded pursuant to standard MCCC protocol implemented for security purposes. The record here is devoid of evidence suggesting a pre-textual motivation for the recording, or any coordinated effort to collect evidence to support a criminal investigation or prosecution. Gillens elected to have incriminating conversations with his girlfriend, aware that jail officials were recording his words. The trial court correctly concluded that no constitutional violation occurred when transcripts of those calls were given to the State for use in Gillens's criminal prosecution. Once lawfully in possession of the contents of Gillens's telephone calls, jail officials were free to give them to the prosecutor's office.

A-1569-16T2

C.    Defendant's Sentence.

We review a sentence for abuse of discretion.  State v. Pierce, 188 N.J. 155, 166 (2006).  We are to affirm a sentence, even if we would have imposed a different one, so long as the sentencing judge "properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record."  State v. Natale, 184 N.J. 458, 489 (2005) (quoting State v. O'Donnell, 117 N.J. 210, 215 (1989)).  Moreover, a sentence imposed pursuant to a plea agreement is presumed to be reasonable because it was negotiated by the parties.  State v. Fuentes, 217 N.J. 57, 70 (2014).

The sentencing court must examine the aggravating and mitigating factors enumerated in N.J.S.A. 2C:44-1(a) and (b).  Each factor found by the court must be relevant and supported by "competent, reasonably credible evidence."  Id. at 72 (quoting State v. Roth, 95 N.J. 334, 363 (1984)).  The court then must conduct a qualitative balancing of the factors to determine the appropriate sentence.  Fuentes, 217 N.J. at 72-73.  One "reasonable" approach is for the court to begin its analysis in the middle range for the offense at issue and determine whether the factors justify departure above or below the middle range.  Id. at 73 (quoting Natale, 184 N.J. at 488).  A sentencing court is not limited to the factual admissions that formed the basis of the plea.  Id. at 71-72.  Instead, "the

sentencing court gathers information necessary to assess the defendant's history and characteristics, and to understand the nature and circumstances of his or her crime." Id. at 72.

Defendant argues that the trial court should not have applied aggravating factor three, N.J.S.A. 2C:44-1(a)(3), because he had a "minor criminal record," and because of the "unique circumstances" of his present offense. In addition, defendant argues the trial court should not have applied aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), because a five year sentence would have satisfied the deterrent and punitive requirements of the criminal code. There is substantial credible evidence in the record supporting the trial court's specific findings of fact with regard to the aggravating and mitigating factors. Defendant had a prior conviction for distributing drugs, hardly a minor crime. In addition, the circumstances of defendant's crime are not unique. When confronted by a group of individuals, defendant, rather than walking away or calling the police, decided to escalate the situation by conspiring with his brother and Gillens, who he summoned to the scene, to commit aggravated assault.

Defendant also argues that it was inappropriate for the court to consider the State's arguments linking defendant to gang activity, and suggesting he ordered the murder of the man with whom he had an argument. However, the

23

court was free to consider all information concerning defendant's life and characteristics in determining his sentence, which includes the statements he made prior to the shooting suggesting that he was a member of a gang and that someone would die that night. Defendant need not have conceded these facts for the court to consider them at his sentencing.

The trial court acknowledged defendant's contention that the statements attributed to him by Alston and other witnesses were incorrect. Having had the opportunity to judge Alston's credibility at a pretrial hearing, the court determined she was credible and accepted her report of what defendant said. The court did not find that defendant was a member of a gang, that he murdered Shakleford, or that the killing was the result of gang-related activity. In fact, the court declined to find aggravating factor five, substantial likelihood defendant was involved in organized criminal activity, N.J.S.A. 2C:44-1(a)(5), applied. The court found instead, based on Alston's credible testimony, that defendant boasted of a gang-related association, and threatened extreme violence during the altercation that preceded Shakleford's shooting.

We also reject defendant's argument that his sentence is excessive. "Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). We are satisfied that the judge's findings and balancing

of the aggravating and mitigating factors are supported by adequate evidence in the record, and the sentence is neither inconsistent with sentencing provisions of the Code of Criminal Justice nor shocking to the judicial conscience.  See Fuentes, 217 N.J. at 70; State v. Bieniek, 200 N.J. 601, 608 (2010); State v. Cassady, 198 N.J. 165, 180-81 (2009).  By his own admission, defendant, a convicted felon on probation, plotted to commit aggravated assault, setting in motion the events that resulted in the senseless murder of a young man in front of his family members.  Ten years of imprisonment is consistent with the gravity of defendant's criminal behavior.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1569-16T2